**ASSOCIATED RADIO SERVICE COMPANY, Plaintiff-Appellee,**

**Associated Radio Company, Plaintiff-Appellant,**

v.

**PAGE AIRWAYS, INC., et al., Defendants-Appellants, Appellees.**

No. 78–1159.

United States Court of Appeals, Fifth Circuit.

Aug. 29, 1980.

Hauer, Woodrow M. Bonesio, Robert E. Goodfriend, Dallas, Tex., for Page Airways & Page Gulfstream, Inc.

Steinberg, Luerssen & Vogelson, Jay M. Vogelson, Dallas, Tex., for Douglas Juston.

Jackson, Walker, Winstead, Cantwell & Miller, Jack Pew, Jr., D. L. Case, Dallas, Tex., for Edwin C. Hamilton & Ross C. Chapin.

Matthews & Thorp, Robert F. Henderson, Joe W. Matthews, Dallas, Tex., John N. McCamish, Jr., Charles J. Fitzpatrick, San Antonio, Tex., for Associated Radio Service Co. (plaintiff-appellee) and Associated Radio Co. (plaintiff-appellant).

Before GEE, FAY and VANCE, Circuit Judges.

GEE, Circuit Judge:

This case involves an acrimonious disagreement between formerly harmonious associates in the aircraft outfitting business. Instead of more familiar antitrust allegations, such as price fixing or tying arrangements, plaintiffs in this case allege essentially that unfair business practices committed by defendants had such a negative impact on competition as to constitute illegal restraints of trade under section 1 of the Sherman Act[1] and conspiracy or attempts to monopolize under section 2 of the Sherman Act.[2] We shall first set out in some detail the nature of the aircraft outfitting business and the facts relevant to the alleged antitrust violations. We will then discuss why we feel that the jury verdicts and judgments in this case must be upheld, except those against defendant Edwin Hamilton.

Donald F. Turner, Washington, D. C., for defendants-appellants, appellees.

Wilmer, Cutler & Pickering, Ronald J. Greene, Arnold M. Lerman, Washington, D. C., Akin, Gump, Hauer & Feld, John L.

*The Aircraft Outfitting Business*

After World War II, outfitting companies sprang up to convert surplus government aircraft to private use. These companies installed or modified avionics in the surplus

---

1. 15 U.S.C. § 1.

2. 15 U.S.C. § 2.

aircraft and constructed new interiors. When aircraft manufacturers began post-war production of planes for private use, the outfitting companies also began to install original avionics and interiors[3] in "green"[4] aircraft delivered new from the factory. Today some twenty major outfitters throughout this country and a few in Europe outfit a variety of private aircraft. Outfitting work includes a mix of original installation in green aircraft and reoutfitting or refurbishing other aircraft for private or business use.

The plaintiffs in this case are Associated Radio Service Company ("Associated") and Associated Radio Company ("Radio"). The defendants are Page Airways, Inc. and its wholly owned subsidiary, Page Gulfstream, Inc. (collectively referred to as "Page"); Douglas Juston, an officer of Page; Ross C. Chapin, former president and director of both Associated and Radio and, at the time of trial, president of Page; and Edwin C. Hamilton, former assistant to Chapin and, at the time of trial, an officer of Page. Associated has been in the aircraft outfitting business under various names and with assorted business associates since 1948. For a time in the mid-1960's, Associated installed avionics in a variety of aircraft, for which Executive Aircraft provided the hangar space and interior installations. This arrangement terminated in 1968, and Associated at that time decided to open its own complete outfitting facility in Dallas. It continues to operate that facility today.

In 1953, Radio was formed to purchase equipment from manufacturers, to own the inventories, and to sell avionics equipment, primarily to Associated. Radio and Associated had common owners, officers, and directors, but Radio had no employees other than its executive officers. Its nonmanagement activities were performed by Associated's employees. After purchasing avionics equipment from manufacturers, Radio added between 10 and 25 percent to its costs in selling the equipment to Associated. In addition, Radio made some other sales of avionics equipment and supplies to third parties.

In 1967 or 1968, Page became a dealer for green Grumman Gulfstream II's (G-II's).[5] The G-II is the largest and has the longest range of any business aircraft on the market. Its avionics is the most sophisticated, complex, and expensive in the industry. Capable of transoceanic flights, it requires inertial navigation systems (INS) in its avionics package. The Grumman Gulfstream II is always sold green. In the factory, a rudimentary flight package is installed to allow the plane to be ferried to the outfitting facility; after the plane has reached the facility, the flight package is removed, and the plane will no longer fly until it is outfitted with avionics. Grumman began production of this model in 1967, at a rate of about 20 per year. It had produced approximately 130 by mid-1973 and could be expected to produce no more than 270 G-II's before that model became obsolete.

Page and Associated entered into an agreement in 1968 whereby Page would sell the green G-II's, and Associated would design and install, in San Antonio, avionics in those planes for Page's customers. A third party was involved for a time in the instal-

---

3. The installation of avionics in turbine-powered aircraft involves the placing of the actual electronic equipment, including inertial navigation systems, if needed, in the aircraft and the wiring of such equipment together, to the controls, and to the power source. An avionics system usually includes flight control, navigation, and communication subsystems. The installation of interiors includes the design and installation of the seats, carpeting, and other interior items in the aircraft cabin.

4. Green aircraft are those new planes that are sold to customers without completed avionics and interior furnishings and that are therefore outfitted by independent companies. Some models that are delivered green include Grumman Gulfstream I and II, JetStar I and II, Hawker-Siddley jets, Merlin, DC-9, 707, 727, some models of the Falcon, and various heavy-duty helicopters.

5. In the early 1970's, Page became exclusive worldwide dealer for the G-II, although customers continued to be able to purchase the G-II directly from Grumman, also.

lation of interiors in the San Antonio G–II facility, but the interior installation operation soon came to be financed and managed by Page and employees of Associated. The name of the interior facility was Associated Page Interiors, Inc. Associated moved its key G–II avionics installation employees to San Antonio and put in a G–II avionics facility that cost about $200,000, plus hangar costs and inventory. Under the contract, Page received as a sales commission ten percent of Associated's billings, except for 18 pending G–II avionics sales that Associated had been working on before its association with Page.

In the years between 1968 and 1973, the contractual arrangement between Page and Associated worked well for Associated. Associated climbed to a prominent position among all avionics outfitters of G–II's; by late 1972, it was installing avionics in just over 50 percent of all G–II's coming off the assembly line. Meanwhile, the number of companies able to compete effectively for G–II outfitting contracts dwindled from eight or nine in 1968 to about five in 1977.[6]

Before a company entering the avionics outfitting business can become profitable, it must overcome certain barriers. For example, its employees must ascend a learning curve during which they gain experience and efficiency in working on a certain type of aircraft. In the case of the G–II, this learning curve was estimated variously at one and one-half to two years.[7] In addition, a company must acquire or create engineering diagrams and gain FAA approval, in the form of Supplemental Type Certificates (STC's), for its avionics package in a particular plane. There was evidence showing that it took Associated about two and one-half years after entry to attain a profitable position. Its average profit on its last nine sales before September 1973 was about $52,000 per plane.[8]

### Defendant's Conduct

Plaintiffs allege that as early as 1971 Page made the decision to enter the avionics outfitting business itself. Plaintiffs further allege that Page entered into an unlawful conspiracy to eliminate plaintiffs as a competitor in the G–II avionics field by, among other things, bribing away plaintiffs' employees; causing the theft of plaintiffs' trade secrets, proprietary information, records, and documents; causing plaintiffs' employees to withhold information from plaintiffs and to work secretly for defendants; interfering with plaintiffs' mechanic's

---

**6.** The following table is taken from defendants' exhibits 311 and 312 and plaintiffs' exhibit 243:

No. Planes per Year Outfitted with Avionics

| Installers | 1968 | 1969 | 1970 | 1971 | 1972 | 1973 | 1974 | 1975 | 1976 | 1977 * |
|---|---|---|---|---|---|---|---|---|---|---|
| Marshall's of Cambridge | 0 | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| AiResearch | 13 | 13 | 11 | 2 | 1 | 7 | 0 | 1 | 2 | 0 |
| Atlantic Aviation | 16 | 8 | 1 | 1 | 2 | 3 | 0 | 3 | 1 | 3 |
| Qualitron | 1 | 1 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 |
| Executive | 2 | 3 | 0 | 0 | 2 | 3 | 4 | 2 | 2 | 0 |
| Pacific Airmotive | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Little Rock Automotive | 0 | 2 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Western Commander/Jet Center | 0 | 1 | 2 | 0 | 0 | 1 | 1 | 3 | 2 | 1 |
| Associated | 5 | 7 | 5 | 4 | 8 | 2 | 1 | 2 | 2 | 0 |
| Page | – | – | – | – | – | 2 | 8 | 10 | 11 | 7 |
| Totals | 38 | 37 | 21 | 7 | 14 | 18 | 16 ** | 21 | 20 | 11 |

 * Represents only the first half of the year.
 ** Two G–II's were outfitted in 1974 by Grumman for NASA's space shuttle program.

---

**7.** Avionics installation in a G–II requires approximately 6 months.

**8.** The G–II's green price was over $3,000,000. Interior and avionics outfitting cost another

lien; and filing spurious lawsuits. The facts show that defendants did indeed hire away Ross Chapin, who was president and director of Associated and vice president and director of Radio, and Edwin Hamilton, Chapin's former assistant. These two men are now officers of Page. Page also copied or caused to be copied engineering diagrams of the avionics packages in several G–II's that had been outfitted by Associated. Some of these copies may have been made before the contractual arrangement came to an end.

In June 1972, Page notified Associated that Page wished to terminate the agreement effective June 20, 1973. It seems that everyone agrees that Page had every right to terminate at that time if it so wished. However, Chapin seems to have allowed contracts for the sale of avionics packages to be made in Page's name while serving as president of Associated and with the knowledge that the airplanes would not be delivered until after the termination of the joint venture. Plaintiffs contend that by copying Associated's engineering drawings and other data, defendants were able to acquire avionics estimated to cost about $250,000 to $350,000 to produce, thus eliminating the two years of effort required for the accumulation of a sufficient number of STC's to be competitive and eliminating the startup losses estimated to cover two and one-half years. By acquiring the avionics drawings and by hiring Associated's employees at the termination of the venture, the defendants were able to avoid the learning curve and to begin work immediately on the avionics packages that Chapin had sold in Page's name.

Associated also contends that an altercation over a debt owed it by Page led to Page filing several spurious lawsuits. In August 1973, Lee Juan Lanford, an officer of Associated, went to San Antonio and discovered that Associated would require several more days' work to complete its avionics installation in a plane belonging to the Republic of Gabon. Lanford advised Page that Associated would not relinquish possession of the plane after the completed installation without being paid the $660,000 sales price, and he parked his camper in front of the hangar door to prevent Page from removing the plane until the price was paid. Associated maintains that they were merely enforcing their mechanic's lien under Texas law. Page then filed a lawsuit based upon an allegedly false affidavit and obtained possession of the plane before the completion of the installation. They then amended their petition and filed an interpleader based upon, again, allegedly false statements and affidavits. Evidently Page also filed other lawsuits in both state and federal court. Through all this, defendants were partially successful in delaying payment of the money due plaintiffs, thus rendering plaintiffs' financial position precarious.

Plaintiffs' allegations of "dirty tricks" committed by Page included bribes or otherwise suspicious payments to various parties. For example, there was evidence that Joseph Anckner, Grumman's director of international sales, took his wife to Hawaii in 1974 for a vacation on money "loaned" to him by Page, although the loan had not been repaid at the time of Anckner's deposition in March 1977; nor had Anckner reported this loan to his employer.[9] In 1975, after Associated had negotiated a contract for avionics installation [10] in a G–II belonging to Kirby-American, Juston complained to Grumman, Anckner visited the customer, and Associated lost the contract to another installer, although not to Page. There was

$800,000 to $1,000,000, with the avionics package alone averaging, in 1973, about $595,000.

**9.** At his deposition, Anckner stated that the loan was in the approximate amount of $1,000, that there was no particular due date, and no interest was discussed.

**10.** After the Associated-Page split, Associated began preparing a G–II outfitting facility at its Dallas base of operations and continued to bid on G–II avionics outfitting. However, it was unable to secure its first contract until late 1974 and only outfitted five green G–II's between mid-1973 and mid-1977. In all, Associated received eight contracts after the arrangement with Page terminated.

also documentary evidence and testimony showing that Chapin, after he began working for Page, was able to get an avionics customer to award its avionics work to Page at $10,000 *over* the *highest* bidder. Thus, Page was able to obtain the outfitting contract at a price of $834,000 at a time when the low bid, $759,000, had been submitted by Associated. There were three other bidders.

Defendants, after entering the avionics installation business, were singularly effective at obtaining contracts for the outfitting of airplanes belonging to foreign governments. In fact, no outfitter except Page sold and installed avionics in a green G–II for a foreign government customer between mid-1973 and mid-1977, the cutoff date for discovery. There were approximately fourteen of such sales during those years. There was evidence from which the jury could infer that payments had been made to officials of some foreign governments in return for their awarding the contracts to Page.

### The Outcome Below

After the termination of the agreement between Page and Associated, Associated brought suit in federal district court in Texas in October 1973. Plaintiff pled violations of sections 1 and 2 of the Sherman Act, relying primarily on the *per se* rule found in the line of cases beginning with *Albert Pick-Barth Co. v. Mitchell Woodbury*, 57 F.2d 96 (1st Cir. 1932). The district judge rejected the application of the *per se* rule on the state of the record as of June 1976 and dismissed the complaint with leave to amend. *See Associated Radio Service Co. v. Page Airways, Inc.*, 414 F.Supp. 1088 (N.D. Tex.1976). Plaintiffs' amended complaint survived defendants' motion to dismiss, and the suit proceeded to trial, which consumed twelve weeks of the summer of 1977. A jury returned a verdict favorable to plaintiffs on all issues. Among other things, the jury found that the relevant market was the sale and installation of avionics systems in Grumman Gulfstream II aircraft throughout the world, that the corporate

and individual defendants conspired, combined, or agreed to restrain trade unreasonably in violation of section 1 of the Sherman Act, that the same defendants monopolized, attempted, or conspired to monopolize the sale and installation of avionics equipment and systems in Gulfstream II aircraft in violation of section 2 of the Sherman Act, and that Associated and Radio sustained injury to their business or property that was proximately caused by the antitrust violations. The jury assessed Associated's damages at $2,750,000 and Radio's damages at $550,000. The court trebled the damage award to Associated and added attorneys' fees, with the total award to Associated being $9,048,210. The court also entered judgment n.o.v. for defendants on the claims of Radio, based on the court's conclusion that Radio did not have standing to sue.

### Relevant Product Market

Since one of the necessary elements of a section 2 violation is the possession of or conspiracy or attempt to acquire monopoly power in a particular market, the jury's finding on the extent of the market must be upheld if we are to sustain the jury's verdict finding violations of that section of the Sherman Act. *See Yoder Brothers v. California-Florida Plant Corp.*, 537 F.2d 1347, 1366 (5th Cir. 1976), *cert. denied*, 429 U.S. 1094, 97 S.Ct. 1108, 51 L.Ed.2d 540 (1977). *See also United States v. Aluminum Company of America*, 148 F.2d 416 (2d Cir. 1945). This court has also held, in a case involving section 1 of the Sherman Act and allegations of unfair competition, that the market power of defendant is crucial. *See Northwest Power Products, Inc. v. Omark Industries*, 576 F.2d 83 (5th Cir. 1978). Moreover, the trial court recognized in its charge to the jury that plaintiffs could not succeed under either section 1 or section 2 without a favorable jury finding on their market definition.

Relevant market is a question of fact, and findings concerning the market should be overturned on appeal only if clearly erroneous or where there is no evi-

dence to support the finding below. *Heatransfer Corp. v. Volkswagenwerk, A.G.,* 553 F.2d 964, 979 (5th Cir. 1977), *cert. denied,* 434 U.S. 1087, 98 S.Ct. 1282, 55 L.Ed.2d 792 (1978). Defendants contended vigorously throughout the trial, and now on appeal, that the relevant market was the sale and installation of avionics *and interiors* in *all* turbine-powered private aircraft. However, since defendants' contentions were before the jury, as was most of defendants' evidence, they essentially ask us to substitute our findings of fact for those of the jury. We think there was ample evidence of high entry barriers and of the difficulty outfitters encountered in switching back and forth from one model of aircraft to the next to allow the jury to find a relatively narrow market.[11] The court's charge on this issue was clear and spelled out the relevant factors for the jury to consider,[12] and we therefore hold that the

11. Defendants' evidence tended to show that an outfitter could get into the avionics business in as little as three months with an expenditure of only $30,000–50,000 and that numerous outfitters switched from one aircraft model to another with relative ease. On the other hand, Associated's evidence tended to show that it was very expensive and time consuming (plaintiffs' estimates ranged up to $3,000,000 and two and one-half years) to enter the G–II avionics installation market and that independent avionics installers do not install avionics in a variety of new aircraft at the same time. Further, there was no evidence that any new company besides Page had begun installing avionics in G–II's after 1969.

12. Now, before you consider the law relative to these violations, of Section 1, as well as defendants' alleged violations of Section 2 of the Sherman Act, it will be necessary for you to determine the relevant market in this case. Both plaintiffs' allegations concerning defendants' intention to eliminate each of them from competing as well as plaintiffs' allegations of violations of Section 2 of the Sherman Act, are concerned with the amount of competition that has been foreclosed, so it will be necessary to define the market in which competition exists before you can determine if the competition within this market has been harmed at all or harmed not insignificantly. Similarly, with regard to market, you must determine its existence before you can consider the issue of defendants' intent, if any, to eliminate plaintiffs from such market, if any.

The relevant market consists of two dimensions: The geographic market and the product/service market. Thus, in determining a relevant market you will be concerned with the questions of what product-service market is involved and who competed for sales in this relevant product/service market . . . . You will not have to find the relevant geographic market, . . . as this fact has been stipulated by the parties. You must however determine from a preponderance of the evidence the relevant product/service market, hereinafter called the "relevant market." The parties are in sharp dispute over what constitutes the relevant market. This dispute must be resolved by you in accordance with the instructions I am about to give you. First, however, I want to summarize what the parties contend regarding the relevant market.

Plaintiffs contend that the *relevant market* within which to judge the conduct about which they complain is the sale and installation of avionics in Grumman Gulfstream II aircraft. The defendants maintain that the relevant market is broader than the sale and installation of avionics in Grumman Gulfstream II only. The defendants submit that no such relevant market exists. The defendants contend that the relevant market includes the installation of both avionics and custom interiors so far as any particular aircraft is concerned and further, that the relevant market as such, includes the sale and installation of avionic equipment and systems, together with custom interiors, in a variety of business aircraft.

In determining the relevant market you must consider the following factors: (1) The lack of reasonable interchangeability of use between the product and/or service itself and substitutes for it; (2) industry or public recognition of the relevant market as a separate economic entity; (3) the product's and/or service's peculiar characteristics and uses; (4) uniqueness of the production facilities required to manufacture or provide the product and/or services; (5) distinct customers of the product and/or services; (6) distinct prices for the product and/or service; (7) sensitivity to price changes and; (8) specialized vendors of the product and/or service.

No one factor is necessarily decisive, but the more of these criteria that the particular relevant market fulfills, the more likely it is a separate *product/service market.*

For the purpose of this case, it is immaterial whether you find from a preponderance of the evidence that the relevant market is a market or a submarket. The relevant market may be either a market or a submarket. The definition of the relevant market is crucial. If the relevant market is the broader definition defendants advance, it would not be possible for you to find that the defendants or

jury's factual finding regarding Associated's claim is supported by the evidence.[13]

### Violations of Section 1

Defendants essentially make two arguments here. One is that plaintiffs only proved that defendants' conduct caused injury to *plaintiffs*, not to *competition*, and thus fell short of the proof necessary under section 1 and our case law. The second argument is that even if Associated attempted to prove injury to competition, it failed.

At the time this case was tried, it was not clear whether this circuit would adopt the *per se* rule found in the *Pick-Barth* line of cases. The trial judge recognized this uncertainty in our case law and dismissed plaintiffs' complaint in an order that reads, in pertinent part:

> Plaintiffs have failed to plead a claim under Section One, although Plaintiff may replead within fifteen days of this order and must ultimately prove either that the particular conduct alleged in this case unreasonably restrains competition or, if Plaintiff wishes this Court to apply a per se analysis, that the alleged conduct is in general so anticompetitive that this Court would be correct in drawing an inference from it that anticompetitive effects will occur in most circumstances when such behavior recurs.

414 F.Supp. at 1090.

It can be seen that the district court at least left the door ajar on the *per se* doctrine, and plaintiffs may have proceeded on to trial under the assumption that they could prove enough to come in under a limited *per se* analysis. However, plaintiffs also attempted to prove that competition in the G–II market had been injured.

> any of them have violated the Sherman Act, as to which I will say, ladies and gentlemen, you may proceed to answer all of the issues based on the preponderance of the evidence and not just Issue Number 1 as to relevant market.

Since the district court entered judgment in this case, our court has spoken on the application of the antitrust laws to allegations of unfair competition. *See Redwing Carriers, Inc. v. McKenzie Tank Lines, Inc.*, 594 F.2d 114 (5th Cir. 1979) (affirming 443 F.Supp. 639 (N.D.Fla.1977)); *Northwest Power Products, Inc. v. Omark Industries, supra.* These cases make clear that the *Pick-Barth per se* doctrine is not to apply and that a plaintiff who alleges unfair competition or other business torts must prove injury to competition.

Defendants advance the proposition that plaintiffs merely proved injury to themselves and claim that the jury verdict must be reversed as a matter of law. While we are extremely reluctant to allow an antitrust claim for treble damages to rest solely on allegations of business torts, we find, contrary to defendants' contention, that Associated's proof in this case was sufficient to withstand the test articulated, after this case was tried, in *Northwest Power.*

In *Northwest Power*, Omark Industries terminated Northwest Power as a distributor of Omark's power-actuated tools, substituting for it Bosco Fastening Service Center. Several of Northwest Power's employees defected to Bosco, and agents of Omark and Bosco made false and disparaging remarks to Northwest's customers in an attempt to eliminate Northwest from the market. 576 F.2d at 85–86. Before its termination, Northwest had been the number two firm in the market, with a 20 percent market share; Bosco held an 11.5 percent share after replacing Northwest, whose share plunged to 2 percent. *Id.* at 86. This court held that the foregoing facts tended to show that "defendants' conduct *enhanced* rivalry rather than reducing it." *Id.* at 91 (emphasis original). In addition, Northwest failed to prove that either

---

13. We hold in a later section of this opinion that Radio failed to prove that a market existed that was confined only to the sale of G–II avionics equipment to installers, and we also hold that Radio lacked standing to sue. Those holdings, however, do not affect the validity of the jury's market finding regarding Associated's claims.

Omark or Bosco earned an excessive profit on its business. *Id.*

We pointed out in *Northwest Power* that "a supplier may switch dealers and conspire with a new dealer to take the place of an established one" without violating the antitrust laws. *Id.* at 86. In fact, Omark probably could have eliminated all distributors of its products by vertical integration (*i. e.*, by beginning distribution of its own products) without running afoul of the antitrust laws. *See* 3 P. Areeda & D. Turner, *Antitrust Law* ¶¶ 725–727, 828c (1978).

█ We now quote extensively from *Northwest Power* in order to spell out the pertinent law in our circuit on unfair competition as an antitrust violation:

The more modern courts examining the *Pick-Barth* rule have stated that it applies only when the defendant is a "significant existing competitor." *Southland Reship, Inc.* [*v. Flegal*, D.C.], 401 F.Supp. [339] at 346–347; *see George R. Whitten, Jr., Inc.* [*v. Paddock Pool Builders, Inc.*, 1st Cir.], 508 F.2d [547] at 562; *Tower Tire & Auto Center, Inc.* [*v. Atlantic Richfield Co.*, D.C.], 392 F.Supp. [1098] at 1108–1109. *But see Atlantic Heel Co.* [*v. Allied Heel Co.*, 1st Cir.], 284 F.2d [879] at 881; *Metal Lubricants Co. v. Engineered Lubricants Co.*, 411 F.2d 426, 430 (8th Cir. 1969). While this requirement begins to limit *Pick-Barth* to Sherman Act proportions, it fails to do the job entirely.

The Sherman Act was conceived as a weapon against monopolies, trusts, and conspiracies which used agreement instead of financial consolidation to achieve the same results. The market power of the defendant charged with a *Pick-Barth* violation is crucial, for two reasons.

First, absent some market impact comparable to that which would be forbidden by the law of mergers, the interests protected by the antitrust laws never arise. *See, e. g., United States v. General Dynamics Corp.*, 415 U.S. 486, 494–498, 94 S.Ct. 1186 [1192–1194], 39 L.Ed.2d 530 (1974). *See generally*, L. Sullivan, Antitrust § 204 (1977). If a defendant could achieve a desired result either by lawful

merger or by engaging in unfair competition, the choice of the unfair competition route alone should not give rise to an antitrust violation.

Second, only if the defendant can gain an increment of monopoly through his unfair competition would the additional sanctions of the Sherman Act, including treble damages and criminal sanctions, be appropriately used to deter him. Single damages or equivalent injunctive relief is thought sufficient to compensate a firm for unfair competition. *Cf.* R. Posner, Economic Analysis of Law 28–29 (1973) (decrying remedies other than actual damages for breach of a restrictive covenant).

The "significant existing competitor" requirement misses the mark in several respects. By not aiming at market power, it omits a number of relevant considerations, including the defendant's market share before and after the unfair conduct, the number and relative size of firms in the market, the conditions of entry, the potential competition from firms outside the market, and whether a trend toward concentration exists. It also excludes cases in which a new entrant possesses such dramatic market power that his conduct, aimed at eliminating competition, threatens the values protected by the Sherman Act. *Cf. United States v. Falstaff Brewing Corp.*, 410 U.S. 526, 93 S.Ct. 1096, 35 L.Ed.2d 475 (1973) (certain market extension mergers illegal).

576 F.2d at 89. It thus can be seen that *Northwest Power* establishes for unfair competition cases under section 1 of the Sherman Act a two-part test: (1) a market effect that would be prohibited under the law of mergers; and (2) other conduct by defendant that threatens Sherman Act values. We shall now examine the facts of the case under consideration in light of this test.

We believe that the first prong of *Northwest Power* is met here. That is, Page's conduct in this case was prohibited by the law of mergers; therefore, the interests

protected by the antitrust laws do come into play. Regarding merger law, we find guidance in *FTC v. Proctor & Gamble Co.*, 386 U.S. 568, 87 S.Ct. 1224, 18 L.Ed.2d 303 (1967) (often called the *Clorox* case), which holds that where a *market is concentrated* and where a *powerful potential entrant* attempts to buy out or merge with the *most significant competitor* in the market, the merger would have such a potential for lessening competition that it could be prevented by the Federal Trade Commission. In this case Page essentially took over, by horizontal entry, the most significant existing competitor in the market, in contrast to the vertical supplier-distributor relationship in *Northwest Power.* Given the jury definition of the relevant market, the evidence is overwhelming that the market was concentrated. From nine competitors for G–II avionics outfitting in 1968–69, the market dwindled in the early 1970's to five in 1977.[14] When the Associated-Page agreement ended in mid-1973, Associated had approximately 50 percent of the market, and four firms were fighting over the other half. Upon Page's entry, its market share went dramatically from zero to 50 percent in one year and had risen to 64 percent[15] at trial.

Additionally, there was conclusive evidence[16] that Page was a potential entrant into the G–II avionics market. Page was exclusive worldwide dealer for the green G–II, it was already in the interior outfitting business through its venture with Associated, and it had the customer contacts, the capital, and the liquidity to be a viable new entrant.[17] Since these facts are within the *Proctor & Gamble* ambit, we find that if Page had attempted to acquire Associated directly, the acquisition would have violated the antitrust laws. Thus, we hold that Associated has cleared the first hurdle in *Northwest Power.*

With regard to the second prong of *Northwest Power*, we note significant differences between it and the case under consideration, differences weighing in Associated's favor. The new distributor in *Northwest Power* held only slightly more than *half* of the market share that had been held by the previous distributor-plaintiff. In contrast, Page now enjoys at least the *same*[18] market share as that formerly held by Associated. More important, there was evidence that the prices Page charged its customers, as well as its profits, went up dramatically from those prices charged and profits taken by Associated;[19] plaintiff in

14. *See* n. 6, *supra.* Since most witnesses agreed that a firm must receive two or three G–II contracts per year to remain in the market, the G–II production rate (about 20 per year), without more, would itself tend naturally to limit the market to about seven firms.

15. *See* n. 16, *infra.*

16. In addition to a great deal of testimony on Page's intent to enter the market, Associated introduced an exhibit (plaintiffs' exhibit 42) consisting of handwritten notes taken by Juston of a meeting in late 1972. The notes clearly show Page's contemplated entry, by means of a buyout or otherwise. The notes also show Page's awareness of the two years required independently to develop engineering and STC's necessary to compete in avionics installations.

17. Our finding that Page was a probable entrant is not foreclosed by the fact that there had been no other new entrants since 1969. No other company had Page's close ties with Grumman.

18. We are chary of placing too much emphasis on exact percentage figures regarding this market. Although Page had garnered 64% (7 out of 11) of all G–II outfittings in the first half of 1977, we note that a single plane can make an enormous difference in the percentages. Thus, we prefer to view Page's share as substantially equal to Associated's pre-1973 share.

19. Contracts were introduced relating to the sale and outfitting of the last nine G–II's completed by Associated prior to September 1, 1973. The cost to the customer for total outfitting averaged just under $823,000 per plane, with the avionics outfitting price to the customer averaging $596,000, or 72%, of the total price. Associated's profit averaged about $52,-000.

Plaintiffs introduced evidence of the total outfitting prices to customers of nine G–II's outfitted by Page after 1973. The average sale price was $1,010,220. This reflects an average price increase to the customer of $187,600 per plane after Page entered the market. While there was no testimony regarding the sales prices charged by Page for avionics alone, we

*Northwest Power* proved no excessive profits or prices. The evidence of foreign bribery, the fact that Page was the only outfitter in 1973–77 to install avionics in the 14 new G–II's belonging to foreign governments, and the testimony that an outfitter requires two or three contracts per year to remain competitive in the market could allow the jury to infer that improper conduct by Page, not competition on the merits, effectively foreclosed a competitive market share to another G–II outfitter. In short, Associated demonstrated that Page has the kind of "dramatic market power,", 576 F.2d at 89, that was lacking in *Northwest Power* and that allows the jury to draw an inference of anticompetitive effect.

As additional support for our holding, we point out that the *Northwest Power* case distinguished the case of *Cherokee Laboratories, Inc. v. Rotary Drilling Services, Inc.,* 383 F.2d 97 (5th Cir. 1967), *cert. denied,* 390 U.S. 904, 88 S.Ct. 816, 19 L.Ed.2d 870 (1968). In *Cherokee Laboratories,* defendant, although a new entrant in the distribution market, possessed great market power because it had an exclusive dealing arrangement with the holder of a patent. This control of supply made defendant a poten-

tial monopolist, and defendant's market power was shown by its raising of prices to plaintiff. Here defendant Page had an exclusive dealing arrangement with Grumman and demonstrated its market power by raising prices to *consumers.*

Defendants complain about the court's charge to the jury, contending that it failed adequately to instruct them on the necessity of finding injury to competition. We believe the charge, some of which is set out in the margin,[20] when viewed in its entirety was adequate to withstand a challenge under *Northwest Power.*

■ Since we hold that Page could not have acquired Associated legally under the antitrust laws and that the acquisition *plus* its anticompetitive conduct afterwards had the requisite anticompetitive effect, we need not reach the issue whether business torts,[21] standing alone, can ever rise to the level of section 1 violations.

### *Section 2 Violations*

In their argument regarding the jury finding of section 2 violations, defendants state in their brief:

note that 72% of the average total price is $727,358, a figure far higher than, the pre-1973 prices. Plaintiffs' expert testified that Page's net avionics profit would average about 70% of the total price, or $117,667, on those nine post-1973 planes, a figure more than double the per plane profit enjoyed by Associated. Of the nine sales of avionics by Page in evidence, six were installed in planes belonging to foreign governments; Page's avionics profits on these sales were even greater, averaging $158,417, more than three times the profit taken by Associated.

Page complains that comparisons between its sales prices and profits and Associated's is meaningless because the price varies enormously with the amount of equipment ordered by the purchaser. However, Page did not introduce any evidence that the nine of its sales chosen by Associated to compare with Associated's sales and profits were nonrepresentative of its sales prices and profits generally.

20. Instruction 37: The requirement that the restraint of trade be unreasonable is referred to as the "Rule of Reason" test of illegality. You are instructed therefore that "restraint of trade" as used in Section One of the Sherman Act applies only to unreasonable restraints and not to all possible restraints of

trade. The antitrust law seeks to maintain free competition in interstate commerce, in order to protect the public interest. The end sought by the antitrust law is the prevention of unreasonable restraints in business and commercial transactions which tend to restrict production, raise prices, or otherwise control or affect the market to the detriment of purchasers or consumers of goods and services; the public is to be protected in order to secure to them the advantages which accrue to them from free competition in the market. Not all restraints of trade are unreasonable restraints. All business affects trade in some way. Therefore, in determining whether a "restraint of trade" exists, you must decide whether the conduct which you have found tends to restrict or otherwise control free and open *competition.* And in determining whether or not such an unreasonable restraint exists, you need not find a specific injury, but you must find that the conduct tends or is reasonably calculated to prejudice the public interest. (Emphasis added).

21. *See* n. 23, *infra.*

The *Pick-Barth per se* doctrine has no more validity under section 2 than under section 1 [citing Cooper, *Attempts and Monopolization: A Mildly Expansionary Answer to the Prophylactic Riddle of Section 2*, 72 Mich.L.Rev. 373, 454–55 (1974); 3 P. Areeda & D. Turner, *Antitrust Law* ¶¶ 737, 828a, 828b (1978)]. Section 2 offenses cannot be based solely on tortious harm to a single competitor; a plaintiff must show in addition "significant and more-than-temporary harmful effects on *competition*" [citing P. Areeda & D. Turner, *id.* ¶ 737b at 278 (emphasis in original)].

Furthermore, defendants assert that "Page, whatever its share of a 'G–II outfitting market,' did not have and does not have monopoly power, and could not have remotely anticipated that the alleged torts would give it any power over price in the outfitting of G–II aircraft."

We think the discussion regarding section 1 violations, *supra*, refutes most of defendants' arguments here. We have held that there were significant and more-than-temporary harmful effects on competition, shown in part by the rise in prices charged to customers and the rise in Page's profits over the profits Associated took. We also note that this market was not infinite and that Grumman at the time of trial could be expected to produce only about 70 more aircraft, thus rendering new entry then almost impossible in light of the difficulties faced by such a new entrant in recouping startup costs and ascending the learning curve in the remaining four years of G–II production.

█ Moreover, we have examined the treatise cited by defendants' brief and reached the conclusion that some unfair business practices *can* be exclusionary.[22] For example, the authors of the treatise state that influencing, inducing, or persuading buyers to specify features of a product that only one company can provide effectively forecloses rivals from competition but that generally there is no impropriety in

such persuasion or influence. 3 P. Areeda & D. Turner, *Antitrust Law* ¶ 738b at 279–80. The authors, however, go on to imply that if buyers were influenced or induced in an improper manner, through bribes or similar practices, this might constitute an exclusionary practice in violation of section 2. *Id.* at 280. Areeda and Turner seem to say that bribes and similar practices are somewhat different from mere misrepresentations of one's own or a rival's product. *Id.* Relevant here is the evidence of foreign bribes. Also pertinent is the domestic contract awarded to Page at $10,000 over the highest bid and the permissible inference that such a contract was the result of improper influence.

Areeda and Turner are adamant in their view that the mere hiring away of employees from a rival is *per se* legal under the antitrust laws and emphasize "the importance of protecting the employee's opportunities for marketing his talents." *Id.* at ¶ 783d at 281; *see also* ¶ 702. However, they go on to state, "No similar virtue would redeem efforts to induce such disloyal performance by a rival's employee as disclosure of trade secrets or other private information; [or] steering customers, researchers, or others away from his employer and to the monopolist." *Id.*, ¶ 738d at 281. The authors imply that such practices would be grounds for section 2 liability if the actual effect was significant. We believe that to be the case here, since the effect was to allow entry through absorption of the most significant competitor by one who possessed great economic power. We note defendants' contention that the engineering drawings and data were not trade secrets, since they could be obtained from Associated's customers, each of whom were required to keep at least one copy of the avionics diagram in the aircraft for servicing purposes. Without deciding this question, we note merely that the jury was presented with conflicting evidence on this point. Certainly, the evidence of Page's conduct concerning Associated employees,

---

22. Unfortunately, this will be cold comfort to one of the authors of the treatise, Donald Turn-er, who happens to be one of Page's able attorneys on appeal.

especially Chapin, allowed the jury to find that gross impropriety had occurred.

Again, in paragraph 738e of the treatise, the authors discuss the general proposition that it is not an antitrust offense to obtain information from a rival's supplier about "the quantity or nature of shipments to or from the rival." Nevertheless, there are again exceptions to the authors' general premise:

> There may be instances in which the means used by the monopolist are unlawful or otherwise clearly improper. For example, . . . the monopolist might "bribe" the supplier's employee who is thus induced to act in his personal interest and not in his employer's interest. Such improprieties can be exclusionary for § 2 purposes whenever they have a significant impact upon the competitive vitality of the rival.

Id., ¶ 783e at 282. Since there was evidence of a "loan" from Page to Grumman's director of international sales and of a later contact by a Page officer with the Grumman employee, after which a Grumman customer withdrew its outfitting contract from Associated, the jury could infer that the Grumman employee was bribed and that the employee acted in his own self interest. The loss of one outfitting contract when the evidence tended to show that as few as two contracts per year would keep a company in the market would have a significant impact upon Associated's competitive position.

There was evidence that tended to show that defendant Page, by filing allegedly sham suits in federal and state court, attempted to withhold from Associated money actually owed to it. The amounts owed were substantial and undoubtedly had a significant impact on Associated's financial situation. In their treatise, Areeda and Turner state that abuse of the litigation process can be an exclusionary practice in some instances. Id., ¶ 738j at 284–85.

Finally, Areeda and Turner in their paragraph of concluding comments sum up their theories about unfair competition vis-a-vis the antitrust laws and reiterate several cautionary notes:

First, antitrust law must be sensitive to the monopolist's "right" to protect himself and to compete vigorously in ways generally allowed. Second, antitrust law must be concerned lest the mere possibility of an exclusionary tendency permit interminable lawsuits inquiring into the "reasonableness" of every utterance or "ordinary" act of the monopolist. Third, to keep analysis manageable, the courts should be willing to adopt presumptions of propriety with respect to some minor acts that might conceivably be exclusionary. To force the inquiry, the plaintiff must be required to make a significant preliminary showing of impropriety. Fourth, the concept of "exclusionary" practice would become totally unmanageable unless the judges are willing to adopt a de minimis test and to ignore those practices that seem unlikely to have made a substantial impact upon the achievement, maintenance, or expansion of monopoly power. Fifth, those who disagree with these observations are bound to reexamine the rationale for looking at so-called exclusionary practices at all. Intellectual honesty should compel antitrust law to acknowledge that it is either (1) looking for a significant causal connection between power and challenged behavior or (2) condemning monopoly power as such (with possible exceptions). If the latter is the law's object, it should do so cleanly without burdening plaintiffs, defendants, courts, and society with a meaningless but endless charade searching for bad practices.

Id., ¶ 739 at 287 (footnote omitted). We agree with the authors that a de minimis rule should be applied by our courts, but we believe that Associated's evidence in this case, which the jury evidently believed, was probative of enough instances of exclusionary behavior on the part of defendants to constitute far more than de minimis violations of section 2. Moreover, Areeda and Turner recognize, in their discussion of the section 2 offense of attempting to monopolize, that conduct violative of section 5 of the FTC Act, proscribing unfair competi-

tion, can at times be exclusionary under section 2. *See id.,* ¶ 830b.

■ Probably no one of the instances of improper conduct,[23] standing alone, would lead to section 2 liability. Taken together, however, they show a pattern of exclusionary behavior sufficient to support the jury's verdict. Certainly, the Sherman Act en-

courages even rough-and-tumble competition *on the merits,* but Associated's evidence would allow the jury to infer that Page's overall success was influenced by factors other than the superiority of its products and services.

The jury instructions [24] on section 2 were substantially correct. Defendants argue

23. We wish to emphasize that we have not held that any specific *torts* were committed. We simply find that there was sufficient evidence for the jury to have found exclusionary conduct.

24. The court's charge on § 2 reads, in pertinent part:

To monopolize means to unlawfully acquire monopoly power, that is, the power to control prices or to exclude competition in the relevant market. The first thing that characterizes a monopolist is the power to control prices. A monopolist can control the price of its goods and force the sellers of like goods throughout the market to conform to its prices. The second thing which characterizes a monopolist is the power to exclude competition from the market. By "power to exclude competition" I mean the power to prevent other businessmen from opening and thereafter profitably engaging in the business involved or sufficient power over the customer's alternatives that other competitors can be excluded from competing in the relevant market.

It is not enough that one company is stronger and more successful than a competitor and may eventually drive a competitor out of business. After all, all competition is a battle for trade, and in each sale one competitor must necessarily lose.

It is only the power to exclude competitors from a market or control prices that violates the antitrust laws. Before you consider whether these defendants have monopoly power as stated in the previous paragraph, you must determine the relevant market applicable to this case pursuant to Instruction Number 39. In determining if Page Airways and Page Gulfstream actually possessed the power to control prices or exclude competitors a most important factor is the size of the market share held by defendants. The larger the market share of the defendant, the more likely that he will be able to control prices or exclude competition. In addition, you may also consider the number and size of other competitors in the relevant market, the ease or difficulty with which new competitors may enter into the market, whether the market share of the defendants has increased or declined and whether competition in the market has become more or less concentrated, that is, whether the number of competitors is

growing smaller while their market shares are growing larger.

Before you can determine if defendants have violated Section 2, you must determine what is the relevant market pursuant to Instruction Number 39 as well as whether defendants possess monopoly power. If you find that defendants possess monopoly power, I caution you that this by itself is not sufficient to find an antitrust violation.

Instruction 41. The offense of monopolization under Section 2 has two elements: (1) The possession of monopoly power in a relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen or historic accident. In addition to the possession of monopoly power, you must also find, in order to hold that defendants violated Section 2 of the Sherman Act, that this power was willfully acquired. The mere possession of monopoly power is insufficient to constitute an antitrust violation. A company may grow very large and thus achieve some power to influence prices and competition in the market. If the company achieves its power through purely legitimate means, that is, growth or development as a consequence of a superior product, business acumen, or historic accident, then it has not violated the antitrust laws.

In this case, plaintiffs have argued that defendants' monopoly was acquired through a series of acts calculated to drive Plaintiff [Associated] out of the market.

In response defendants deny that they have monopoly power, or, if they have it, they deny that such power was unlawfully acquired. Defendants further deny that any of their actions were done with an anticompetitive motive or by virtue of any agreement. If you believe that the defendants' actions do not demonstrate a willingness or purpose to exclude competition or were not responsible for a monopoly, then you will not find that defendants have unlawfully monopolized in violation of Section 2 of the Sherman Act. If, however, you believe defendants or any of them possess monopoly power and that such power was willfully acquired, you should find that such defendants have unlawfully monopolized in violation of Section 2 of the Sherman Act.

that they could not be found guilty of monopolizing as a matter of law, since their market power was insufficient to support such a charge. They further contend that since the jury found that they had monopolized, attempted to monopolize or conspired to monopolize, the verdict under section 2 cannot stand because it cannot be ascertained whether it rests on an impermissible ground. To be sure, Page's market power did not rise to the level existing in some cases that find actual monopolization. *See, e. g., United States v. Grinnell Corp.,* 384 U.S. 563, 86 S.Ct. 1698, 16 L.Ed.2d 778 (1966); *Standard Oil Co. v. United States,* 221 U.S. 1, 31 S.Ct. 502, 55 L.Ed. 619 (1911); *United States v. Aluminum Company of America,* 148 F.2d 416 (2d Cir. 1945). However, when Page's market share is viewed alongside the evidence of the number of actual competitors, the high barriers to entry, the limited number of G–II's remaining at the time of trial to be produced, and Page's power over price, we believe the court below correctly submitted the issue to the jury. *See Boeing Co. v. Shipman,* 411 F.2d 365 (5th Cir. 1969) (en banc). "The relative effect of percentage command of a market varies with the setting in which that factor is placed." *United States v. Columbia Steel Co.,* 334 U.S. 495, 528, 68 S.Ct. 1107, 1124, 92 L.Ed. 1533 (1948). *See also* L. Sullivan, *Antitrust* §§ 22–32 (1977).[25]

Instruction 42: The offense of "attempt to monopolize" also has two essential elements: (1) Specific intent to monopolize; and (2) some act or acts done in furtherance of an intent to monopolize, which, although insufficient to actually produce monopoly power creates a dangerous probability that monopolization will occur. In order to find an attempt to monopolize, both elements—the intent and the act or acts—must appear and together they must result in a dangerous probability that the defendant will achieve a monopoly of the relevant market. It is not necessary, however, in order to constitute an attempt to monopolize that the defendants' action actually succeed in achieving monopoly power.

In deciding the question of whether there has been an attempt to monopolize, you are instructed that the phrase "specific intent" means more than merely an intention to engage in any act. It means, therefore, plaintiffs must prove by a preponderance of the evidence, that the defendants specifically intended to injure or destroy competition or control prices. Accordingly, the evidence that any particular act was engaged in by the defendants would not be sufficient in and of itself on the issue of an attempt to monopolize unless you find that such act was done by reason of a specific intent to injure or destroy competition or to control prices.

Instruction 43: As a general rule, it is reasonable to infer that a person ordinarily intends all the natural and probable consequences of acts knowingly done or knowingly committed. With respect to the issue of intent, the jury is entitled to consider any statements made or acts done or omitted by defendants, and all facts and circumstances in evidence in the case which may aid determination of state of mind. If you find that the defendants in their business practices were predominately motivated by legitimate business aims and that there was no specific intent to control prices or to injure or destroy competition in an appreciable part of trade or commerce, then you would find against the plaintiffs on the question of an attempt to monopolize. However, if you find that it was more likely than not that the defendants' actions were motivated by their desire to acquire monopoly power by means other than free competition and if you find it more likely than not that there was a dangerous probability that monopoly would be achieved, then you would find in favor of the plaintiffs on an attempt to monopolize claim.

Instruction 44. With reference to the offense of conspiracy to monopolize, it is necessary for the plaintiffs to prove by a preponderance of the evidence that (1) there was a conspiracy; (2) the object and purpose of the conspiracy was or is to achieve monopoly power; and (3) that there was or is specific intent to injure the plaintiffs as well as competition. I have already defined for you the meaning of a conspiracy in our discussion of Section 1 of the Sherman Act. That definition is applicable here. However, unlike Section 1, a conspiracy to violate Section 2 must be a conspiracy to obtain monopoly power, that is, the power to exclude competition or control prices rather than to merely restrain competition, as in Section 1.

For the offense of conspiracy to monopolize, it is not necessary to demonstrate that the goal of monopoly power was or will be achieved.

25. If we had held that the issue of monopolization should not have been submitted to the jury, we could not allow the general verdict on section 2 liability to stand, even though there was sufficient evidence on attempt and conspiracy. *See Sunkist Growers, Inc. v. Winkler & Smith Citrus Products Co.,* 370 U.S. 19, 29–

■ In conclusion, we wish to reiterate here our holding in *Northwest Power:* "Single damages or equivalent injunctive relief is thought sufficient to compensate a firm for unfair competition." 576 F.2d at 89. This opinion should not be read to encourage all who suffer injury to business or property through an alleged business tort to bring suit under section 1 or 2 of the Sherman Act. The holding of this case rests on a narrow foundation, and only those cases coming within the ambit of these particular facts should be considered.

### Evidentiary Rulings

■ Since we held in our foregoing discussion of section 2 violations that evidence of bribery of customers' representatives or of the employee of the supplier, viewed in the context of evidence of other exclusionary conduct, could be probative of a section 2 violation, we reject defendants' contention that this evidence was irrelevant. We think plaintiffs made the requisite preliminary showing that the bribes had an effect upon competition; thus, the trial court was correct in denying defendants' motion in limine. The fact that the evidence was highly inflammatory merely requires the trial court to employ the balancing test under Fed.R.Evid. 403. We are not convinced that the trial court abused its discretion here, and we sustain its rulings.

■ Defendants also attack the trial court's rulings regarding the admission of

evidence of defendants' lawsuits against plaintiffs. This issue was fully considered by the trial court in its earlier opinion in this case. *See* 414 F.Supp. 1088, 1094–96. The gist of that opinion is that evidence of the lawsuits was relevant since plaintiffs alleged that they were brought not for a proper purpose but for the purpose of achieving an unlawful objective—*i. e.,* to destroy plaintiffs by strangling plaintiffs' source of funds. We agree with the district court that the *Noerr-Pennington* doctrine[26] does not extend first amendment immunity to such abusive acts. *See id.* at 1096. It should be noted that the district court required plaintiff not only to show that the defendants had an illegal purpose in filing the lawsuits but that defendants also committed specific acts, other than those incidental to the normal use of the courts, directed at attaining the illegal objective. *Id.* We agree with that analysis and that requirement.

### The Jury Charge

■ We are convinced from a careful reading of the entire charge that it was, in substance, correct. Defendants contend that the jury was given little or no guidance on how to evaluate the various allegations of improper conduct. We disagree. The pertinent parts of the charge[27] adequately cover defendants', as well as plaintiffs', contentions regarding the improper conduct.

---

30, 82 S.Ct. 1130, 1135–1136, 8 L.Ed.2d 305 (1962); *Smith v. Southern Airways, Inc.,* 556 F.2d 1347 (5th Cir. 1977); *but see Woods Exploration & Producing Co. v. Aluminum Co. of America,* 438 F.2d 1286, 1304 (5th Cir. 1971), *cert. denied,* 404 U.S. 1047, 92 S.Ct. 701, 30 L.Ed.2d 736 (1972) (where the evidence was sufficient to create a jury question on monopolization, a verdict identical to the one at issue here could stand without our deciding whether the evidentiary requirements regarding attempts and conspiracies were met). Even so, the damage award would still be supported by the jury's verdict on section 1 liability.

26. *See Eastern R. R. President's Conference v. Noerr Motor Freight,* 365 U.S. 127, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961), and *United Mine Workers v. Pennington,* 381 U.S. 657, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965).

27. Instruction 52: This completes my instructions with respect to the antitrust law as it applies to this case. There are, however, additional instructions of law which must be given which relate to whether some of the evidence introduced by plaintiffs really supports their antitrust claims. For example, the plaintiffs claim that defendants filed, or caused to be filed, two legal proceedings in San Antonio with the intent to economically coerce the plaintiffs. This is a serious allegation because the First Amendment of the United States Constitution guarantees all of us the right to petition our government including the courts. We would all, I am sure, be less likely to invoke our right to petition the court if the assertion of that right always carried with it the dangerous possibility that we would later be sued for asserting that right. However, the First Amendment does not shelter those who abuse the judicial process.

The plaintiffs claim that the defendants abused the judicial processes in two ways. First with respect to the legal proceeding whereby the defendants obtained from a state court judge in San Antonio an ex parte injunction which required Mr. Lanford to remove his camper from the Dee Howard hangar, the plaintiffs contend that the defendants caused the state judge to rule as he did by making material misrepresentations.

A material misrepresentation is defined as a false representation made with the knowledge or belief on the part of the declarant that the representation is false with an intention to induce the court to act or to refrain from acting in reliance upon the misrepresentation and there is justifiable reliance upon the misrepresentation on the part of the court in taking action or refraining from it. If you find that the representations made to the San Antonio court by the defendants or any of them in inducing the court to issue an ex parte injunction were material misrepresentations under the above definition, then you must decide whether these material misrepresentations were made with the intent to economically coerce the plaintiffs.

For your information, the term "ex parte" injunction action means, in this context, a judicial proceeding where action is taken or granted at the instance and for the benefit of one party only, and without notice to, or contestation by any other person adversely interested.

If you find that material misrepresentations were made to the court and that these material misrepresentations were made with the intent to economically coerce the plaintiffs, the fact that the defendants filed this ex parte injunction action would be evidence supporting plaintiffs' antitrust claims. However, if you find that no material misrepresentations were made or, even if material misrepresentations were made, that they were not done with the intent to economically coerce the plaintiffs, then you must disregard completely the evidence presented to you with respect to the ex parte injunction action in San Antonio.

Related to the ex parte injunction proceedings is an interpleader suit filed by the defendants against plaintiffs in San Antonio. Again, this interpleader proceeding is normally protected from scrutiny within the context of this lawsuit, by the First Amendment. You are instructed that an interpleader action is defined as follows: When two or more persons claim the same thing (or fund) of a third, and he, laying no claim to it himself, is ignorant which of them has the right to it, and reasonably believes he may be prejudiced by their proceeding against him to recover it, he may file a proceeding against them, the object of which is to make them litigate their claim between

themselves, instead of litigating it with him and such an action is called an interpleader action. However, the plaintiffs again contend that defendants abused the legal process in filing this interpleader action. Thus, plaintiffs say that this suit was not for the purpose of pursuing the legitimate purposes of an interpleader action but was filed with the intent to economically coerce the plaintiffs by tying up funds owed to them. You are instructed that for the purpose of determining whether an abuse of process occurred in this interpleader action that an abuse of process means the intentional use of legal process for an improper purpose incompatible with the lawful function of the process by one with an ulterior motive in doing so. The only ulterior motive at issue here is the plaintiffs' allegation that the defendants were trying to economically coerce plaintiffs by tying up monies owed to them. If you find from a preponderance of the evidence that this interpleader action was instituted not for the legitimate purposes of an interpleader suit as I have just defined it but for the purpose of economically coercing the plaintiffs then you may consider the filing of this interpleader action as evidence in support of plaintiffs' antitrust claims. If you find to the contrary, you must disregard all evidence concerning the interpleader suit as it is protected from the scrutiny under the First Amendment.

\* \* \* \* \* \*

Instruction Number 54: The plaintiffs contend that defendants furthered their anticompetitive scheme through the practice of "commercial bribery." There is a distinction to be made between commercial bribery of domestic corporations and citizens on the one hand and foreign officials on the other. I want to instruct you first with respect to the law on domestic commercial bribery.

"Commercial bribery" generally is a practice whereby one company obtains business by making secret payments to an employee of another company who in return steers business to the briber. Specifically, a commercial bribe is a secret payment made to an employee of one corporation for that employee's personal benefit by an employee of another corporation for the purpose of having the bribed employee use his influence to cause his corporation to favor the other corporation in preference to the other competitors. In our competitive system it is assumed that many companies will complete for business and will obtain that business based upon their own merit such as a superior product, lower price, and/or quick, efficient delivery and service. The practice of commercial bribery, however, distorts this competitive process as the business is awarded not on merit but through the corrupting of the buyer's employees. If you find from a preponderance of

the evidence that any or all of the defendants engaged in commercial bribery, this evidence would support the plaintiffs' antitrust claims.

I further instruct you that a loan to an employee of a company from which business is obtained may or may not be a commercial bribe, depending upon the intent of the parties. If the parties genuinely regard the transaction as a loan and intend that the money should be repaid, then no commercial bribe has occurred. Finally if the defendants did not intend to offer to pay a commercial bribe, then you may not find that a bribe was made or offered even if you believe that the recipient of the favor took it to be a bribe. The intent of the parties in this case is a question which you must decide on the basis of the evidence presented to you.

Instruction 55: Plaintiffs have also alleged that Page Airways, Page Gulfstream and Mr. Juston collectively or individually bribed Mr. Chapin and/or Mr. Hamilton and other of plaintiffs' employees. A bribe in this context again means that secret payment made to an employee of one corporation for that employee's personal benefit by an employee of another corporation with an improper or corrupt motive. If you find that any one of the defendants bribed Mr. Chapin or Mr. Hamilton or any other of plaintiffs' employees, you must further decide whether it was for an anticompetitive purpose.

You are further instructed that it is not improper for an employee to work for and accept money from two employers at the same time if both employers are aware that such a relationship exists and agree to that arrangement. Moreover, it is not improper for an employee to make arrangements to compete with his employer before the termination of his employment, so long as he does not use his employer's time or any trade secrets in so doing and further that he does not breach his duty of loyalty to his present employer. You are instructed that "trade secrets" means any formula, pattern, device or compilation of information which is used in one's business and which gives one opportunity to obtain advantage over competitors who do not know or use it.

You are instructed that it is undisputed that the plaintiffs and the defendants in this case were from 1968 until June, 1973, engaged in a cooperative venture whereby each played a role in the outfitting of planes for the mutual benefit of all. It is entirely possible, therefore, that the employees of one would assist the employees of the other from time to time as the need arose in the furtherance of the joint effort. This conduct alleged by the plaintiffs is not improper if the respective employers knew about the arrangement and gave it their consent.

Furthermore, you may find that during the period from June of 1968 until June of 1973, when the agreement between the parties was in effect, that defendants paid employees of the plaintiffs money. Such conduct would not be improper so long as the money was paid for work done on the projects that both plaintiffs and defendants had a mutual interest in completing, and the money was not paid to encourage plaintiffs' employees to do acts detrimental to the interest of the plaintiffs. However, you may find that the money was paid to encourage plaintiffs' employees to do acts detrimental to the interest of the plaintiffs, and this would fall under the definition of commercial bribery.

Finally, you are instructed that after the agreement between the plaintiffs and defendants came to an end in June, 1973, there was a period of transition during which those who had previously worked together had to adjust their relationships. If, therefore, you find that some employees of plaintiffs did work for the defendants because of an honest mistake as to their proper duties, or because of the confusion during the transition period or because such employees honestly believed they would be terminated by plaintiffs and did such acts, as they did, to further their own employment prospects with the defendants, this would not be evidence in support of plaintiffs' claims unless you find from a preponderance of the evidence that defendants encouraged or ratified this conduct.

Instruction 57: Next, we come to the issue of foreign bribery. If you find that the defendants have engaged in commercial bribery of foreign government officials, this may be evidence of: (1) The willful acquisition or maintenance of monopoly power or; (2) an act performed in furtherance of an attempt to monopolize or; (3) an act performed in furtherance of a conspiracy to monopolize; or (4) an unreasonable restraint of trade. However, before you may consider this as evidence of any or all of the foregoing antitrust violations you must find: (1) This foreign commercial bribery is not an accepted industry practice in the foreign market and is not illegal under the law of that foreign country which defendants must prove to you by a preponderance of the evidence and (2) it was not compelled by a foreign government or a foreign government official which defendants must prove by a preponderance of the evidence. By "compelled" I mean that the "foreign bribe" is a cost of doing business in the particular country and failure to make the payments results in the competitor inevitably losing the business. The fact that I have instructed you with respect to the foreign bribery issue does not mean that I have a view on the matter one way or the other or that foreign bribery has been established.

The defendants contend that no foreign bribery occurred. Their position is that it is "quite common for a foreign government to deal through an intermediary when making a purchase of goods and equipment outside of its own country," and to pay commissions to that foreign intermediary is usual and legal.

A bribe, on the other hand, is a secret payment made to foreign government official for that official's personal use and for the purpose

## Damages

Given our conclusion that defendants' hiring away of Associated's key employees and its copying of the engineering diagrams and STC's would have been illegal had it been attempted as a buyout or merger, we believe that Associated should be allowed to base its damage calculations on assumptions that included the continuing services of Ross Chapin and its continued exclusive use of the engineering drawings and STC's. There was evidence that plaintiffs' average profit per sale of avionics in 1973 was about $52,000. Plaintiffs' expert, Dr. Block, projected lost earnings based on Associated's retaining its 51.6 percent share of the market and on an average per plane profit of $55,000. It is defendants' view that the profit figures should have been based on Associated's experience in the years 1969–73. However, some of those years reflected the growing pains of a new

of having that official use his official influence to cause his government to choose the briber's product over that of a competitor.

The State of Sabah is governed by the laws of Malaysia. Under Malaysian law it is a crime for a public servant to take gratification other than legal remuneration in respect of an official act. The pertinent part of the statute reads: Article 161:

"Whoever, being or expecting to be a public servant, accepts or obtains, or agrees to accept or attempt to obtain, from any person, for himself or for any other person, any gratification whatever, other than legal remuneration, as a motive or reward for doing or forbearing to do any official act, or for showing or forbearing to show, in the exercise of his official function favor or disfavor to any person, or for rendering or attempting to render any service or disservice to any person, with the Government, or with any member of the Cabinet or of Parliament, or of a State Executive Council or Legislative Assembly, or with any public servant, as such, shall be punished with imprisonment for a term which may extend to three years, or with fine, or with both."

Explanation: Expecting to be a public servant. If a person not expecting to be in office obtains a gratification by deceiving others into a belief that he is about to be in office, and that he will then serve them, he may be guilty of cheating, but he is not guilty of the offense defined in this section.

Gratification: The word gratification is not restricted to pecuniary gratification, or to gratifications estimable in money.

"Legal Remuneration." The words Legal Remuneration are not restricted to remuneration which a public servant can lawfully demand, but include all remuneration which he is permitted by law to accept.

"A motive or reward for doing." A person who receives a gratification as a motive for doing what he does not intend to do, or as a reward for doing what he has not done, comes within these words.

You are instructed that the law of Uganda is as follows:

Any person employed in the public service who directly or indirectly agrees or offers to permit his conduct in such employment to be influenced by the gift, promise, or prospect of any property or benefit to be received by him, or by any other person from any person whomsoever is guilty of a misdemeanor and is liable to imprisonment for three years.

Any person who endeavors directly or indirectly to influence the conduct of a person employed in the public service in respect of the duties of such employment by the gift, promise or prospect of any property or benefit to be received by such person employed in the public service, or by any other person, is guilty of a misdemeanor and is liable to imprisonment for three years.

Any person, who, being employed in the public services takes or accepts from any person for the performance of his duties as such officer any reward beyond his proper pay and emoluments, or any promise of such rewards, is guilty of a misdemeanor and is liable to imprisonment for three years.

Any person who, being employed in the public service, receives any property or benefit of any kind for himself, on the understanding, express or implied, that he shall favor the person giving the property or conferring the benefit, or anyone in which that person is interested, in any transaction then pending, or likely to take place, between the person giving the property or conferring the benefit, or anyone in whom he is interested, and any person employed in the public service, is guilty of a misdemeanor and is liable to imprisonment for six months.

If plaintiff proves to you by a preponderance of the evidence that the defendants bribed foreign officials in either Sabah or Uganda, then you must decide from a preponderance of the evidence whether this is an accepted industry practice in the relevant market.

If you find from a preponderance of the evidence that this is not an accepted industry practice then you must decide whether defendants have proved from a preponderance of the evidence that the foreign government compelled these payments. If defendants have not proved this defense then you may consider such "foreign bribes" as you have found as evidence of the various monopolization claims which you have already been instructed on.

business, and the jury was entitled to consider just the last year in which Associated installed G–II's before the contractual breakup. Furthermore, we consider Dr. Block's projections to be fairly conservative, since they were based on an assumption that Grumman would produce only 250 G–II's, while the evidence shows that Grumman now intends to produce about 270, and since plaintiffs' evidence showed that Page's avionics profits on nine aircraft it outfitted after 1973 averaged $117,667, more than double the per plane average profit figure espoused by Dr. Block.

■ In short, we think the jury verdict that was based on plaintiffs' damage projections was supported by relevant evidence. The damages were not based on mere speculation or guesswork, see *Bigelow v. RKO Radio Pictures*, 327 U.S. 251, 264, 66 S.Ct. 574, 579, 90 L.Ed. 652 (1946), and the expert's assumptions were supported by the evidence introduced at trial. *See Heatransfer Corp. v. Volkswagenwerk, A.G.*, 553 F.2d 964, 984 (5th Cir. 1977), *cert. denied*, 434 U.S. 1087, 98 S.Ct. 1282, 55 L.Ed.2d 792 (1978).

Defendants contend that the trial court erred in not telling the jury to examine carefully Dr. Block's assumption that Associated would continue to receive all its former share of the G–II outfitting business despite the lawful termination of the contract between it and Page and despite competition from Page. However, the fact of the termination of the contract was before the jury, as were Page's attempts to enter the market. The jury could have reasonably inferred that, absent the improper conduct by Page, Associated would have continued to receive approximately half of all G–II avionics outfitting contracts, in light of Ross Chapin's extensive customer contacts built up during the Associated-Page venture.

*Standing of Associated Radio Company*

■ The trial court granted judgment n. o. v. in favor of defendants on the claim of Associated Radio Company ("Radio") based on Radio's lack of standing to sue,

holding that Radio's injury flowed merely from its position as creditor and supplier to Associated. We agree with the trial court's action for two reasons. First, while there was ample evidence for the jury to infer that there was a separate market for the sale and installation of avionics equipment *in* G–II airplanes, there was *no* evidence that a market existed that was limited to the sale of G–II avionics equipment *to* companies like Associated. The fact that Radio tended to concentrate its sales to G–II installers (that is, Associated) is not probative of the existence of a separate market. It may only reflect a business choice made by Radio to so limit its business. We find no evidence concerning the companies with which Radio competed, the range of other products that these companies sell, or the identity or nature of their customers. In short, Radio totally failed to prove that there was a separate market for the sale of avionics to installers who concentrated on the G–II aircraft.

Second, we agree that the only damages Radio proved "resulted from the ripple effect caused by defendants' actions against plaintiff [Associated]." Radio showed only that it had lost business from its customer, Associated, which in turn was restrained in its sale and installation of G–II avionics. Under this proof, Radio lacked standing to sue. *See Tugboat, Inc. v. Mobile Towing Co.*, 534 F.2d 1172 (5th Cir. 1976); *Jeffrey v. Southwestern Bell Telephone Co.*, 518 F.2d 1129 (5th Cir. 1975); *Volasco Products Co. v. Lloyd A. Fry Roofing Co.*, 308 F.2d 383, 393–95 (6th Cir. 1962), *cert. denied*, 372 U.S. 907, 83 S.Ct. 721, 9 L.Ed.2d 717 (1963).

Radio vigorously contends that it had standing to sue and suffered antitrust injury because some of defendants' actions were aimed directly at it. However, under the target area test, a plaintiff must show more than animus directed toward it and resulting injury; it must show that its business or property interests exist in the "area of the economy" that is endangered by a "breakdown of competitive conditions" caused by the defendant. *Jeffrey v. Southwestern Bell Telephone Co.*, 518 F.2d at

1131. Here the affected area of the economy was the business of installing avionics systems in G–II aircraft. If any other area was affected, Radio failed to prove it. Since Radio did not function in the outfitting business but merely sold avionics equipment to outfitters, it cannot recover under the antitrust laws and our case law. Thus, we approve the trial court's granting of judgment n. o. v. for defendants with regard to Radio.

### The Case Against Defendant Hamilton

 We find as a matter of law that the evidence of defendant Edwin Hamilton's conduct, even if entirely credible, will not support the judgment against him. The case against Hamilton rests on two alleged instances of misconduct. First, Hamilton accepted a Christmas bonus from Page in 1972 while he was still on Associated's payroll. Second, he assisted Page in its efforts to lease office space in San Antonio and in purchasing the office's furniture, obtaining a miniwarehouse for Page to store equipment, and setting up the telephone system. There was no evidence that Hamilton assisted with the copying of the engineering drawings that Associated had developed or with any other acts detrimental to competition. Moreover, Hamilton was not shown to have participated in any commercial bribery or allegedly sham lawsuits. We reiterate that *all* of this conduct, taken together, rose to the level of a section 2 violation and that isolated acts, standing alone, did not. Thus, the judgment against Hamilton is reversed.

AFFIRMED in part and REVERSED in part.