William S. KAYE, as Receiver for Barterline, Ltd., Plaintiff-Appellant,

v.

PAWNEE CONSTRUCTION COMPANY, INC., et al., Defendants,

Birmingham Trust National Bank, Defendant-Appellee.

No. 81-7304.

United States Court of Appeals, Eleventh Circuit.

July 22, 1982.

James L. Shores, Jr., Birmingham, Ala., for plaintiff-appellant.

George M. Taylor, III, William C. Knight, Jr., William F. Murray, Jr., Birmingham, Ala., for defendant-appellee.

Before GODBOLD, Chief Judge, MERRITT * and HENDERSON, Circuit Judges.

GODBOLD, Chief Judge:

Appellant Kaye, as receiver for Barterline, Ltd., filed a six-count complaint against numerous defendants alleging violations of the Securities Act of 1933, the Securities Exchange Act of 1934, the Securities Act of Alabama, and three Alabama fraud statutes. At the conclusion of appellant's case the court directed a verdict on all counts for defendant Birmingham Trust National Bank. The case proceeded to final judgment with respect to the remaining defendants, and no party has appealed therefrom. In this appeal Kaye only raises the correctness of the directed verdict for Birmingham Trust. We affirm.

## I. The standard for directed verdicts

The Fifth Circuit en banc in *Boeing Company v. Shipman*, 411 F.2d 365 (5th Cir. 1969),[1] enunciated the standard to determine whether there is sufficient evidence to submit a case to the jury following a motion for a directed verdict in a federal court trial. The district court should consider all evidence and not just evidence supporting the nonmover's case. The evidence must be considered in the light and with all reasonable inferences most favorable to the party opposed to the motion. If the facts and inferences point so strongly and overwhelmingly in favor of one party that reasonable persons could not reach a different conclusion, the court should direct a verdict. On the other hand, if there is substantial evidence of such quality and weight that reasonable persons in the exercise of impartial judgment might reach different conclusions, the court should deny the motion for a directed verdict and submit the case to the jury. A mere scintilla of evidence is insufficient to present a question for the jury; there must be a conflict in substantial evidence to create a jury question. *Boeing*, 411 F.2d at 373–76 & nn.13–16.

## II. The facts

Appellee Birmingham Trust loaned Pawnee Mining and Coal Sales (Pawnee) $2.2 million in 1975. As security the bank took

---

* Honorable Gilbert S. Merritt, U. S. Circuit Judge for the Sixth Circuit, sitting by designation.

1. This case, handed down prior to September 30, 1981, is binding as precedent in the Eleventh Circuit. *See Bonner v. City of Prichard*, 661 F.2d 1206 (11th Cir. 1981) (en banc).

a chattel mortgage on substantially all of Pawnee's equipment and an assignment of three coal leases. Lamar Hawkins, president of Pawnee, personally guaranteed the loan, and three Chicago investors guaranteed the loan up to $700,000. Pawnee Construction, a related corporation, signed the note as co-maker. In 1976 the bank loaned Pawnee an additional $750,000 to provide working capital, to bring current the arrearage on the first loan and to pay for the equipment and construction costs of a cleaning plant. As collateral the bank took a security interest in the cleaning plant and the lease of the real estate on which the plant was located, as well as mortgages on realty in Winston and Marion Counties, Alabama.

In early 1977 Pawnee became delinquent in its payments. The bank said it would foreclose on the collateral unless all delinquent payments on the indebtedness were made on or before March 10, 1977. In early March Pawnee contacted Barterline, which had expressed an interest in acquiring mining companies. Barterline and Pawnee met in New York. Barterline was told that Birmingham Trust intended to foreclose if the debt was not brought current by March 10, and it telephoned Birmingham Trust to request an extension of time. The bank refused, saying it was fully collateralized. Undaunted, Barterline went to Birmingham that evening with expectations of personally persuading the bank to extend the deadline.

Before meeting the bank officials Barterline spent two days examining records, equipment, and mining sites and meeting with Pawnee. On March 10 Barterline and Pawnee went to the bank. Birmingham Trust refused to extend the deadline. The bank assured Barterline it would collect its money because it was fully collateralized. It had inspected the equipment recently and found all of it in working order except some that was in the shop. Nardone, president of Barterline, recalls the bank saying the collateral had a value "in excess of three to one" to the debt and that the bank had an assignment of all the mining leases owned by Pawnee Mining. The bank never wavered. It had "been down the road with Mr. Hawkins [Pawnee] many times before" and was going to foreclose unless the bank received $183,586.94 by three o'clock that afternoon. On leaving the bank Barterline decided there was not enough time to investigate the purchase and decided against it.

During lunch Barterline and Pawnee representatives sat a few tables apart at a restaurant. Simner [of Pawnee] talked to Barterline about the proposed sale. Simner asked if Barterline would buy Pawnee if Barterline obtained an assignment of the bank's collateral position. Interest was rekindled and negotiations continued. Reports and lists were compiled, a contract was drawn up, and papers concluding the sale of Pawnee to Barterline were signed around six o'clock that evening.

A one-page letter agreement signed by Barterline, Birmingham Trust, and Pawnee allowed Barterline to assume the bank's collateral position. It recited the principal of the two notes and the amount required to bring them current. It explained that Barterline was willing to pay the $183,-586.94 provided Birmingham Trust agreed it would assign the promissory notes to Barterline "if [Barterline] pay[s] the remaining unpaid principal balance and all unpaid interest thereon at any time in the future. Provided that the Borrower consents to this arrangement, we [Birmingham Trust] agree that upon payment in full to the bank of all indebtedness to this bank by you, we will transfer, setover, and assign to you without representation, warranty, or recourse our interest in the promissory notes evidencing the indebtedness and all security agreements and other security securing these obligations." Barterline paid the $183,586.94 but never paid the bank the remainder of the debt, and Birmingham Trust never transferred the collateral to Barterline.

Pawnee went into receivership in July 1977. Barterline is also in receivership.

Barterline brought suit against numerous defendants, including Birmingham Trust. At the close of Barterline's case defendants moved for a directed verdict. The district judge granted Birmingham Trust's motion for directed verdict, explaining why he dismissed the securities acts claims but not why he dismissed the fraud claims. The case continued against the remaining defendants. None of the remaining defendants, including Pawnee, is a party to this appeal.

### III. The securities acts

■ The district court correctly directed a verdict for Birmingham Trust on the claims under §§ 12(2), 15 and 17 of the Securities Act of 1933, §§ 10 and 20 of the Securities Exchange Act of 1934, and the Alabama Securities Act because the note and collateral were not securities within the meaning of the federal and state securities laws. In oral argument before this court appellant acknowledged that there was no federal or state securities act violation.[2] There was no error in directing the verdict for Birmingham Trust on the three securities laws claims.

### IV. The pendent Alabama fraud claims

The district court also directed a verdict in favor of Birmingham Trust on three Alabama fraud claims: innocent misrepresentation, Ala.Code § 6–5–101; suppression of material facts, Ala.Code § 6–5–102; and willful misrepresentation, Ala.Code § 6–5–103. This ruling was correct, for reasons discussed as follows.[3]

#### (A) Innocent misrepresentation

§ 6–5–101 same [Fraud]—Misrepresentations of material facts.

Misrepresentation of material fact made willfully to deceive, or recklessly without knowledge, and acted on by the opposite party, or if made by mistake and innocently and acted on by the opposite party, constitute legal fraud.

■ In actions for misrepresentation of material facts under § 6–5–101 there must be a false representation, the false representation must concern a material existing fact, and the plaintiff must be damaged as a proximate result. *Earnest v. Pritchett-Moore, Inc.*, 401 So.2d 752, 754 (Ala.1981); *Pugh v. Kaiser Aluminum & Chemical Sales, Inc.*, 369 So.2d 796, 797 (Ala.1979); *International Resorts, Inc. v. Lambert*, 350 So.2d 391, 394 (Ala.1977). The listed factors have particularized meanings. For example, misrepresentation requires an affirmative statement or misrepresentation. *Mann v. Adams Realty Co.*, 556 F.2d 288, 296 (5th Cir. 1977). The good faith of the party making the statement is immaterial, *Maring-Crawford Motor Co. v. Smith*, 285 Ala. 477, 480, 233 So.2d 484, 487 (1970). No employment or contractual relationship need exist, *Standard Oil Company v. Johnson*, 276 Ala. 578, 580–581, 165 So.2d 361, 363–64 (1964), and an intent to deceive is not essential, *Hall Motor Co. v. Furman*, 285 Ala. 499, 502, 234 So.2d 37, 40 (Ala. 1970); but an intent that the fact be relied on as an inducement to act or not to act is essential. *Id.* 40; *Cartwright v. Braly*, 218 Ala. 49, 52, 117 So. 477, 479–80 (1928); *St. Paul Fire & Marine Insurance Co. v. Anderson*, 358 So.2d 151, 155 (Ala.Civ.App.1977), *rev'd on another issue*, 358 So.2d 167 (Ala. 1978) (concurring opinion stressing that the intent of the speaker to induce the plaintiff to act is an essential element in innocent

---

**2.** Previously appellant had contended that the security involved was Pawnee's capital stock and not the bank's notes and collateral. But Barterline acquired 100% of Pawnee's stock from Pawnee Construction and Metco Capital. Under the "economic realities" test of *United Housing Foundation, Inc. v. Forman*, 421 U.S. 837, 95 S.Ct. 2051, 44 L.Ed.2d 621 (1975), this sale by two shareholders of a business to one person with the transfer of 100% of the stock as indicia of ownership was not the sale of "securities," *see King v. Winkler*, 673 F.2d 342, (11th Cir. 1982), so the securities acts do not apply to the sale of Pawnee.

**3.** With respect to each of these Alabama statutes, there are additional grounds that support the court's ruling. It is not necessary that we discuss all the grounds.

misrepresentation when the context is of a casual nature or where reasonableness of plaintiff's reliance is an issue). The representation normally must be of a present fact not a future fact, *Sly v. First National Bank*, 387 So.2d 198 (Ala.1980) nor an opinion, promise, or prophesy, *Fidelity & Casualty Co. v. J. D. Pittman Tractor Co.*, 244 Ala. 354, 358, 13 So.2d 669 (1943), unless the statement was expressed such that the other person may reasonably treat it as a fact, *id.* at 358, 13 So.2d at 672, or if "there are circumstances tending to show fraudulent intent at the time of the promise or representation," *Ringer v. First National Bank*, 291 Ala. 364, 368, 281 So.2d 261, 265 (1973).

■■■ What constitutes a material fact is narrower for innocent misrepresentation than for willful misrepresentation. *Cartwright v. Braly*, 218 Ala. 49, 52, 117 So. 477, 480 (1928). Under § 6–5–101 misrepresentations must be reasonably certain and definite. Representations of wholly different wording, in which a similar impression is conveyed by implication, do not suffice. *Braly*, 218 Ala. at 53, 117 So. at 481. This is especially true when one person trusts another based on the representation of an uninterested person and suffers loss. *Ringer v. First National Bank*, 291 Ala. 364, 367, 281 So.2d 261, 264 (1973). The person relying on the representation must believe the fact to be true, and his reliance must be reasonable under the circumstances: if a person has reason to doubt the truth of a representation or is informed of the truth before he acts, he has no right to act on it. *Bedwell Lumber Co. v. T & T Corp.*, 386 So.2d 413, 415 (Ala.1980). Alabama courts recognize that § 6–5–101 was an effort to enact the common law principle of constructive fraud, *Maring-Crawford Motor Co. v. Smith*, 285 Ala. 477, 480, 233 So.2d 484, 487 (1970), and they accept the common law

principle that knowledge of such facts which ought to excite inquiry that, if pursued, would lead to knowledge of other facts operates as constructive knowledge of the other facts. *Bedwell Lumber Co.*, 386 So.2d at 415.

This overview states enough Alabama law to permit us to review this case. Appellant has not set out clearly and specifically what he considers to be material misrepresentations. We have, therefore, combed his brief and the record and identified four possible contended misrepresentations, but none survives a motion for a directed verdict.

■■ The first possible misrepresentation was that the bank was adequately collateralized. We find no proof that this was a misrepresentation. Pawnee owed the bank $2,326,388 on March 10, 1977, according to the letter dated March 10, 1977, and signed by representatives of Barterline, Pawnee, and Birmingham Trust. Securing the debt was equipment (appraised by the bank in 1975 at approximately $1.9 million) and a cleaning plant (cost per unaudited financial statements as of December 31, 1976, was $695,000).[4] Yet this was not all the collateral the bank possessed. Birmingham Trust also had assignments on two coal leases with estimated coal reserves of 3.9 million tons, a mortgage on the lease at the cleaning plant location, mortgages on real estate (not leases) in Marion and Winston Counties rumored to be valued at $900,000, full guarantees by Pawnee Construction Company and by Hawkins, who was president of both Pawnee Construction and Pawnee Mining, and guarantees totaling $700,000 by three Chicago investors. Without some showing by appellant that this collateral would not cover the amount of the debt, reasonable persons could make no

---

4. According to the unaudited financial statements, the cost of the plant and all equipment as of December 31, 1976, was $3.9 million and the net book value after depreciation was $2.8 million. The equipment was insured for approximately $3 million. None of these figures

qualifies as the fair market value as of March 10 and neither party proves fair market value or liquidation or forced sale value; however, the most conservative of these figures indicates the value of the plant and equipment approximated the loan balance.

finding other than the bank was adequately collateralized. A directed verdict was proper as to this representation.

The second possible misrepresentation was that the collateral had a value in excess of three to one of the debt. Of the people at the meeting at the bank, only Nardone recalls this representation being made: "[W]hen I asked [Sandlin] why he made the loan of two point two [million dollars] to consolidate all of the loans together, he said in their review of the equipment and of the leases that they took as additional collateral, they were at least three to one in a collateral position against their loan." There are several deficiencies in appellant's assertions that this statement should go to the jury on an innocent misrepresentation claim. First, as stated earlier appellant never showed the value of the collateral securing the debt, so we have no proof the statement is false.[5] Second, the statement was of the value of the collateral. Alabama courts consider a statement of value to be an opinion and not a fact. *See, e.g., Stevens v. Alabama State Land Co.,* 121 Ala. 450, 25 So. 995 (1899) (land); *Lake v. Security Loan Association,* 72 Ala. 207 (1882) (stock). Whether a given representation is an opinion or a fact "depends upon all the circumstances of the particular case, such as the form and subject matter of the representation and the knowledge, intelligence and relation of the respective parties." *Fidelity & Casualty Co. v. J. D. Pittman Tractor Co.,* 244 Ala. 354, 358, 13 So.2d 669, 672 (1943). When parties deal at arm's length and the recipient of a statement is not fraudulently induced to forbear inquiries that a competent person would make for his own protection, "expressions of opinion as to matters which lie in opinion merely—opinions as to current market val-

ues furnishing the most common example —" will not be grounds for a misrepresentation claim because the recipient, knowing the nature of such expressions, has no right to rely on them. *Id.* Even an opinion on value is actionable, however, if the recipient states his ignorance and invites the opinion, and the speaker understands the recipient relies on the speaker's opinion as a fact so that the onus of a confidential relation results:[6] if the recipient forbears independent inquiry because of an opinion elicited under these circumstances of confidence, Alabama courts will treat the statement as a fact reasonably relied upon. *Id.* No reasonable person could find, however, that a confidential relation between Birmingham Trust and Barterline ever existed: the parties dealt at arm's length, the phrase "adequately collateralized" was based on the values of qualitatively and quantitatively differentiated, nonliquid assets, Barterline knew of Pawnee's precarious financial situation, and Birmingham Trust understood that Barterline had inspected the coal mines, the cleaning plant, the equipment and Pawnee's business records. Third, the statement related to the value in 1975, so the statement could not have been of a present fact in 1977. The directed verdict was proper.

The third possible misrepresentation was that the collateral securing the debt was intact and that the equipment was in "working order except that some was at the shop." Skelton [of Birmingham Trust], who had inspected the equipment within two months of the March 10 meeting, and Nardone, who had inspected the equipment March 8–9, came away with similar impressions: the equipment was basically in good shape. Although some evidence surfaced after the district court dismissed Birming-

---

5. Birmingham Trust in 1975 appraised the equipment at $1.9 million. The coal reserves for the three originally assigned leases based loosely on the sales price of one of them were worth around $1 million. The Chicago investors' guarantees totaling $700,000 we assume were worth $700,000. We cannot even venture

a guess at the value in 1975 of the full guarantees by Hawkins and Pawnee Construction.

6. An action for misrepresentation also lies when there are circumstances tending to show fraudulent intent at the time of the opinion. *Ringer v. First National Bank, supra.*

ham Trust that the equipment needed repairs, the evidence at the end of appellant's case-in-chief indicated the equipment was acceptable. Moreover, since Nardone was more familiar with mining equipment than Skelton and knew Skelton's investigation was with no more scrutiny than his, his reliance on Skelton's concept of working order would not have been justified.

■ Appellant's argument on appeal seems not to be that the equipment was not in good condition but that it was not intact. The only evidence we can locate that the equipment was not intact was that a bulldozer and a crusher were missing,[7] but this does not give appellant an action for misrepresentation. Birmingham Trust never said these were part of the collateral, and the first time any Barterline representative could have known the two pieces were ever part of the collateral was when a list attached to the purchase agreement listed the two pieces of equipment, both pieces marked through and the words "insurance claim" beside the dozer. Therefore, at the same time Barterline found out Pawnee might have owned the two pieces of equipment it also learned that the items were no longer part of the collateral, or at minimum had knowledge of such facts that should have excited inquiry that, if pursued, would have led to knowledge that the equipment was no longer part of the collateral. *See Bedwell Lumber, supra.* The directed verdict was appropriate.[8]

■ The fourth possible misrepresentation, and we quote appellant's brief, was that:

> Skelton and Sandlin [of Birmingham Trust] told the Barterline people the

Bank had an assignment on all of the mineral leases. Instead of having collateral on leases covering an estimated fifty million tons of coal, the Bank's assignment covered only 8,000,000 tons represented by three leases. But, none of those three assignments had been recorded.

Appellant overstates his case. According to Nardone (Barterline), Birmingham Trust told him it had a UCC statement including accounts receivable, all leases, and "everything else." In fact, Birmingham Trust had filed a UCC financing statement broad enough to reach all leases, so the precise statement was not a misrepresentation. *See Earnest v. Pritchett-Moore, Inc.*, 401 So.2d 752 (Ala.1981); *Nobility Homes, Inc. v. Ballentine*, 386 So.2d 727 (Ala.1980). Similarly, Birmingham Trust never represented it had recorded the assignments. The directed verdict was proper.

### (B) Willful misrepresentation

§ 6–5–103. Deceit—Right of action generally.

Willful misrepresentation of a material fact made to induce another to act, and upon which he does act to his injury, will give a right of action. Mere concealment of such a fact, unless done in such a manner as to deceive and mislead, will not support an action. In all cases of deceit, knowledge of a falsehood constitutes an essential element. A fraudulent or reckless representation of acts as true, which the party may not know to be false, if intended to deceive, is equivalent to a knowledge of the falsehood.

■ Knowledge of the falsehood with intent to deceive is required under

---

**7.** After March 10 four rock trucks inspected by Nardone earlier in the week were missing. Thus, there is no argument that the trucks were missing when Skelton inspected the equipment or even that the bank represented the trucks were part of the collateral.

**8.** We do not understand appellant to say that the collateral was not intact because Pawnee sold the Glenwood lease, one of the three assigned leases. Barterline first learned Pawnee

had sold this lease at the New York meeting, Pawnee told them so again when Nardone [of Barterline] visited the Glenwood mine, Birmingham Trust said at the meeting at the bank that it had been sold, and the purchase agreement said the property was not included in Pawnee's assets and that Pawnee was released from all continuing obligations on the lease. Thus Barterline knew the Glenwood lease was no longer part of the collateral.

§ 6–5–103. *Hall Motor Co. v. Furman*, 285 Ala. 499, 234 So.2d 37 (1970). The statements at issue here are the same ones discussed under innocent misrepresentation. There is no substantial evidence that Birmingham Trust intended to deceive Barterline when it made the statements. Its position was consistent: it would foreclose if the account was not brought current. Not only was there overwhelming evidence that the bank had no intent to deceive Barterline into making the note payments or purchasing Pawnee, Barterline in reaction to the bank's adamant refusal to extend the deadline decided not to purchase Pawnee. The directed verdict was proper.

### (C) Suppression of material facts

§ 6–5–102. Suppression of material facts.

Suppression of a material fact which the party is under an obligation to communicate constitutes fraud. The obligation to communicate may arise from the confidential relations of the parties or from the particular circumstances of the case.

 By the terms of this section either the confidential relations of the parties or the particular circumstances of the case must impose an obligation to communicate. *Chapman v. Rivers Construction Co.*, 284 Ala. 633, 640, 227 So.2d 403, 410 (1969). Unless confidential relations or special circumstances exist mere silence is not a fraud; there must be active concealment or misrepresentation. *Collier v. Brown*, 285 Ala. 40, 228 So.2d 800, 802 (1969). There was no confidential relationship between Birmingham Trust and Barterline, *see, e.g., Sly v. First National Bank*, 387 So.2d 198 (Ala.1980), so any duty to disclose must arise from the particular circumstances of this case. *Chapman.*

For any duty to communicate to arise in this case Birmingham Trust had to fail to disclose a fact, the concealment must have been of a material fact, Birmingham Trust must have induced Barterline to act by the concealment, Birmingham Trust had to know of the materiality or the facts must so constitute an element of the value of the transaction that the law will infer knowledge of its materiality, and Birmingham Trust must have had superior knowledge of the undisclosed fact. *See Marshall v. Crocker*, 387 So.2d 176, 178–79 (Ala.1980) (quoting *Jordan & Sons v. Pickett*, 78 Ala. 331 (1884)); *Chapman v. Rivers Construction Co.*, 284 Ala. 633, 642, 227 So.2d 403, 412 (1969).

According to the Alabama Supreme Court in *Marshall v. Crocker*, 387 So.2d 176, 179 (Ala.1980) (quoting *Jordan & Sons v. Pickett*, 78 Ala. 131 (1884)):

[F]raudulent concealment is defined to be, "the failure to disclose a material fact, which the vendor knows himself, which he has a right to presume the person with whom he is dealing is ignorant of, and of the existence of which the other can not, by ordinary diligence, become acquainted." Concealment implies design, or purpose. That it may furnish a sufficient cause of action, the fact suppressed must not be only material, but the materiality must either be known to the seller, or the facts must so constitute an element of the value of the contract, as to authorize the inference of knowledge of its materiality. The concealment must be for the purpose of continuing a false impression or delusion under which the purchaser has fallen, or of suppressing inquiry, and thereby effecting a sale—with the intention to conceal or suppress—and it must operate an [sic] inducement to the contract.

Though the intention is a question for the jury, where the fact and its materiality are known to the seller, and the suppression is willful or intentional, it may be regarded as done with an intention to deceive or mislead, and the purchaser not having equal access of information may be regarded as defrauded.... When the means and sources are equally accessible to both parties, the ignorance of the pur-

chaser is regarded as self-deception, unless art or artifice is employed to prevent investigation, or stifle information. But, when the access to information is not equal, as when it rests in the personal knowledge of individuals unknown, or exclusively in the knowledge of the seller, the concealment of a known material fact, though without art or artifice, if willful or intentional, is, on the same principle as a misrepresentation not known to be false, sufficient to sustain a right of action.

The three facts appellant says Birmingham Trust had a duty to disclose were that the bank's assignments of the coal leases had not been recorded, the bulldozer and the crusher were missing, and equipment insurance premiums due February 25, 1977 had not been paid. What we have already said covers the missing bulldozer and crusher. With respect to the coal leases, no "particular circumstances" imposed on the bank any obligation to come forward with information that the assignments had not been recorded. The public records of the counties where the coal lands were located were open to Barterline for its examination. At least where there is not a confidential relationship, it is anomalous, if not frivolous, to fault another (on allegations of suppression of facts) for failure to supply information that is freely available by examination of the public records maintained under state recording acts whose purpose is to give notice to persons who may be affected.

With respect to the failure of Pawnee to pay its insurance premiums, the loan agreement between Pawnee and the bank

required Pawnee to maintain customary insurance with a loss payee clause to the bank, and also provided that if Pawnee failed to pay for required insurance the bank could insure the property, and that Pawnee agreed to repay the amount so paid (and until repaid the amount could be added to the principal of the debt). Barterline contends that insurance premiums due February 25, 1977 on equipment policies were not paid, and it appears to contend that the bank had knowledge of this fact when, on March 10, it told Nardone that it was "fully insured." [9]

Under the default provision of the loan agreement, if Pawnee failed to keep any of its promises made in the loan agreement or other instruments, all indebtedness would become due and payable without notice, and the bank could foreclose. Based on this provision, Barterline contends that the nonpayment of insurance premiums was a second and existent ground for default of which it should have been told,[10] and that failure to reveal nonpayment was a suppression of a material fact. This argument fails at the threshold. There is no evidence that the bank knew on March 10 that the insurance premiums had not been paid. A witness for the bank denied that it had such knowledge, and there is no evidence to the contrary. An unsigned collateral receipt of the bank is in the record, dated March 7, 1977, acknowledging receipt for the bank files of the two policies covering the equipment. The record also contains a copy of a statement from the insurance agency to Pawnee, dated March 25, 1977, that includes billings for the two policies. We find nothing in the record of significance to support Barterline's theory that the bank knew that

9. Witnesses for the bank said insurance was not discussed with Nardone, but the jurors were entitled to accept the testimony of Nardone that Sandlin of Birmingham Trust told him the bank was "fully insured."

10. Barterline does not contend that the statement that the bank was "fully insured" was a misrepresentation. Rather it relies upon nonpayment of premiums. It is not contended that

when Sandlin and Skelton of Birmingham Trust talked to Nardone on March 10, the bank had received notice that the insurance policies had been cancelled (or that in fact they had been cancelled). Nardone testified that the insurance agent came to see him in early April and told him that the insurance had been terminated. This is the earliest reference to cancellation.

premiums had not been paid and suppressed this fact.

Moreover, by ordinary diligence Barterline could have learned of the nonpayment of premiums. It was aware that Pawnee was in default with the bank and of a reason for default—failure to pay $183,000 as and when due. It was aware that the bank intended to foreclose unless that amount was paid forthwith. Barterline was free to inquire of the bank whether insurance policies required to be maintained on mortgaged equipment were current, and whether there were any other grounds on which default might be predicated. There is no evidence it made any such inquiry. Also, Barterline had examined Pawnee's records and could have determined from them, or by inquiry to Pawnee's insurer, whether Pawnee was current in payment of premiums on the equipment policies. Barterline did not exert ordinary diligence to seek the facts.[11]

There is no substantial evidence on the basis of which the jury could find a suppression of material fact under § 6–5–102.

### V. Conclusion

Appellant admits he had no securities claim. Under the standards of *Boeing v. Shipman* the district court did not err in directing a verdict for Birmingham Trust on the fraud counts.

AFFIRMED.

---

11. Because of the foregoing conclusion, it is unnecessary for us to address whether the bank, even if it knew of nonpayment of premiums, was under a duty to disclose this to Barterline. *See Sly v. First National Bank*, 387 So.2d 198 (Ala.1980); *Nobility Homes, Inc. v. Ballentine*, 386 So.2d 727, 730 (Ala.1980); *Marshall v. Crocker*, 387 So.2d 176 (Ala.1980).