**L.A. DRAPER AND SON, INC.,**
**Plaintiff,**

v.

**WHEELABRATOR–FRYE, INC., a corporation; Hessco Industrial Supply, Inc., a corporation; and Fred Z. Hester, Defendants.**

Civ. A. No. 80–G–0958–S.

United States District Court,
N.D. Alabama, S.D.

March 16, 1983.

---

**26.** Amended complaint at ¶ 19.

Thad G. Long and Joseph B. Mays, Jr., Bradley, Arant, Rose & White, Birmingham, Ala., for plaintiff.

L. Murray Alley, L. Vastine Stabler, Jr., and Lee E. Bains, Jr., Cabaniss, Johnston, Gardner, Dumas & O'Neal, Birmingham, Ala., for Wheelabrator-Frye, Inc., and Hessco Indus. Supply, Inc.

Ralph D. Gaines and Sidney Hardy, Gaines, Cleckler, Robbins & Goodrich, P.C., Talladega, Ala., for Fred Z. Hester.

## MEMORANDUM OPINION

GUIN, District Judge.

This is an action under the Sherman Act, 15 U.S.C. §§ 1 *et seq.,* with a pendent state claim for unfair competition.

At the close of the plaintiff's case on the thirteenth day of trial, the defendants, Wheelabrator-Frye, Inc., HESSCO Industrial Supply, Inc., and Fred Z. Hester, moved for a directed verdict. During the hearing on the motion for directed verdict, defendants made an oral motion to dismiss the

pendent state claim without prejudice, stipulating that the time period from the filing of the present action in federal court to the trial court's entry of final judgment would be excluded from the calculation of any period for the statute of limitations. At the conclusion of the hearing on these motions, the court dictated into the record its decision to grant defendants' motion for directed verdict as to the antitrust claim in Count One of the complaint and denying the motion as to the unfair competition claim in Count Two. The court also granted the oral motion to dismiss the pendent state claim without prejudice to its disposition in state court. Plaintiff has filed Motions for Various Types of Alternative Relief, which the court elects to treat as a motion for reconsideration. That motion is denied. This memorandum opinion sets forth the findings of fact and conclusions of law upon which the court's denial is based.

L.A. Draper & Son, Inc. ("LADSCO"), is a corporation incorporated under the laws of the State of Alabama, with its principal place of business in Anniston, Alabama. Since 1958 LADSCO has been in the business of selling foundry supplies, including abrasive shot, primarily in the states of Alabama, Georgia, Mississippi, Tennessee, North Carolina, South Carolina, Kentucky, and Florida. Wheelabrator-Frye ("W–F") is a corporation incorporated under the laws of the State of Delaware, with its principal place of business in Indiana. For many years, Wheelabrator-Frye was the principal supplier to LADSCO of abrasive shot. Abrasive shot are pellets with a variety of industrial uses including the cleaning of castings and applying a finish to metal. Fred Z. Hester, a resident of Anniston, Alabama, for approximately 22 years, was a managerial employee of LADSCO. For the last eight or ten years of his employment, Hester was Vice-President and Director of LADSCO. On August 23, 1979, Hester resigned from employment with LADSCO and sometime thereafter joined with several other former LADSCO employees to form HESSCO Industrial Supply, Inc. ("HESSCO"), a foundry supply business located chiefly in Anniston, Alabama. Thus HESSCO and LADSCO became competitors.

The plaintiff complains that HESSCO is an unfair competitor and that the circumstances surrounding its formation and ultimate acquisition by Wheelabrator-Frye violate Section One of the Sherman Act, 15 U.S.C. § 1.

■ The appropriate standard for determining the adequacy of a claim under the Sherman Act, Section One, for unfair competition cases is the following two-part standard: (1) a market effect that would be prohibited under the law of mergers, and (2) other conduct by the defendant that threatens Sherman Act values. *Associated Radio Service Co. v. Page Airways, Inc.* 624 F.2d 1342 (5th Cir.1980), *cert. denied* 450 U.S. 1030, 101 S.Ct. 1740, 68 L.Ed.2d 226 (1981); *Northwest Power Products, Inc. v. Omark Industries, Inc.*, 576 F.2d 83 (5th Cir.1978), *cert. denied* 439 U.S. 1116, 99 S.Ct. 1021, 59 L.Ed.2d 75 (1979). To meet the first part of the test there must be a concentrated market and a powerful potential entrant attempting to buy out or merge with the most significant competitor in that market, so that the merger would have such a potential for lessening competition that it could be prevented by the Federal Trade Commission. *Associated Radio v. Page Airways,* 624 F.2d at 1352. "If a defendant could achieve a desired result either by lawful merger or by engaging in unfair competition, the choice of the unfair competition route alone should not give rise to an antitrust violation." *Northwest Power v. Omark Industries,* 576 F.2d at 89. The second prong of the test is met if the defendants engage in anticompetitive conduct having an anticompetitive effect. *Id.* at 89–90; *Associated Radio v. Page Airways,* 624 F.2d 1353. The decision of this court is definitively resolved on the second prong of the *Northwest Power* test; thus, this opinion will consider that aspect first.

The plaintiff alleged that the defendants engaged in four activities which threaten Sherman Act values: resale price maintenance, unlawful territorial restrictions, ty-

ing arrangement, and group boycott. The court finds that there is no substantive evidence to support any of these claims.

*Resale Price Maintenance*

The rule binding in this circuit governing cases of alleged resale price maintenance was stated in *Aladdin Oil Co. v. Texaco, Inc.,* 603 F.2d 1107, 1117 (5th Cir.1979), quoting *Butera v. Sun Oil Co.,* 496 F.2d 434, 436–57 (1st Cir.1974):

> Resale price maintenance is, in the absence of state fair trade legislation, a *per se* violation of the antitrust laws. *Kiefer-Stewart Co. v. Joseph E. Seagram & Sons, Inc.,* 340 U.S. 211, 71 S.Ct. 259, 95 L.Ed. 219 (1951); *Dr. Miles Medical Co. v. John D. Park & Sons Co.,* 220 U.S. 373, 31 S.Ct. 376, 55 L.Ed. 502 (1911). But before this doctrine can come into play there must be resale price maintenance. The Supreme Court cases have involved situations in which the attempt to set retail prices was clear. In *Simpson v. Union Oil Co.,* 377 U.S. 13, 84 S.Ct. 1051, 12 L.Ed.2d 98 (1964), upon which [plaintiff] relies, Union Oil had signed an agreement with the retailer containing the latter's promise to resell at the price set by Union Oil. In *Kiefer-Stewart* a refusal to sell at a fixed price was met by a concerted refusal to deal. In *Albrecht v. Herald Co.,* 390 U.S. 145, 88 S.Ct. 869, 19 L.Ed.2d 998 (1968) and *United States v. Parke, Davis & Co.,* 362 U.S. 29, 80 S.Ct. 503, 4 L.Ed.2d 505 (1960), the retailer was confronted with minimum or maximum prices and harassed by his supplier and others if he stepped out of line. Taken together, these cases suggest that a case of illegal resale price maintenance is made out when a price is announced and some course of action is undertaken or threatened contingent on the willingness or unwillingness of the retailer to adopt the price. The action need not necessarily fit under the rubric "coercion", but it must involve making a meaningful event depend on compliance or non-compliance with the 'suggested' or stated price. The dealers in *Parke, Davis* and *Albrecht* were told that the harassment directed against them would end as soon as they

acceded to the manufacturer's price desires. The cancellation of the lease in *Simpson* was a direct consequence of the refusal to charge the manufacturer's desired price. The other cases adhere to the same pattern. *Cf. Lehrman v. Gulf Oil Corp.,* 464 F.2d 26 (5th Cir.), *cert. denied* 409 U.S. 1077, 93 S.Ct. 687, 34 L.Ed.2d 665 (1972); *Bowen v. New York News, Inc.,* 366 F.Supp. 651 (S.D.N.Y.1973).

■ Plaintiff alleged that Wheelabrator-Frye imposed a system of resale price maintenance on LADSCO. Since there has been no written contract between these two parties since 1969 or 1970, LADSCO relied on the old contract to make out its case on this claim. The plaintiff tried to show that the old contract with the defendant required it to "maintain ... the prices and terms and observ[e] ... all sales policies and regulations as established by Wheelabrator Corporation." The plaintiff did not establish that the aforementioned provision remained in force after the late 1960s when the alleged wrongdoing at the center of this dispute is said to have occurred; though there was evidence that the tenor of the agreement continued after its lapse. More importantly, however, there has been no evidence of the coercion, harassment, or intimidation on the part of the defendants required to make out a prima facie case of illegal price maintenance. What the evidence did show was that Wheelabrator thought that in instances where the plaintiff's salesman called upon the same customers as its own jobbers the two "ought to be selling at the same price." Wheelabrator's view about prices did not issue forth as an ultimatum; it was little more than a stated preference about the manner in which business should be conducted where both manufacturer and distributor are calling upon the same potential customer. There has been no showing that Wheelabrator, in any way or at any time, threatened the plaintiff with harm to its business if it did not comply with a certain price list. What the evidence does show is that LADSCO's success in selling Wheelabrator's products was due to its willingness to sometimes cut its profit margin

and reduce its prices. Even though Wheelabrator was aware of this, there is no evidence that it took any action, coercive or otherwise, to stop it.

Wheelabrator-Frye never conditioned dealing with LADSCO upon compliance with its suggested prices. No meaningful event turned upon LADSCO's compliance when its contract with Wheelabrator contained a pricing provision. There has been no contract in force since 1969 or 1970, and no evidence that the unwritten working arrangement between the parties contained a pricing provision. Wheelabrator-Frye has certainly not tried to enforce such a provision. This being the case, these facts will not maintain a resale price claim; the plaintiff's proof fails.

*Tying Arrangement*

■ In *Box Maxfield, Inc. v. American Motors Corp.,* 637 F.2d 1033, 1037 (5th Cir. 1981), the Fifth Circuit said that an illegal tying arrangement has four characteristics:

(1) two separate products, the tying product and the tied product;

(2) sufficient market power in the tying market to coerce purchase of the tied product;

(3) involvement of a not insubstantial amount of interstate commerce in the tied market; and

(4) anticompetitive effects in the tied market.

The plaintiff alleged that defendants violated the Sherman Act by facilitating a tying arrangement of shot with equipment and parts. As a Wheelabrator-Frye distributor, plaintiff wanted to sell W–F parts and equipment in addition to the shot it was selling, but was not permitted to do so. It is undisputed that LADSCO had been remarkably successful in selling abrasives such as shot. They were Wheelabrator's largest distributor of that product. But LADSCO's business relationship to Wheelabrator was limited to abrasives; it did not encompass the sale of parts. There is testimony to the effect that Wheelabrator did not think that because LADSCO was successful selling shot it would be equally successful selling parts. Thus Wheelabrator made a bona fide business decision regarding the selection of a distributor for parts.

More to the point of the issue of tying, however, is the simple fact that the alleged facts do not constitute tying. To make out a case of tying violative of the antitrust laws the plaintiff must establish that the defendant distributor tied two products (a more and a less marketable one) and conditioned the sale of the more marketable one upon the purchase of the less desirable, "tied" companion. The facts of this case show, rather than the imposition of undesirable goods as a condition for purchasing more salable ones, the manufacturer limiting the distributor to certain products that he (the distributor) has shown himself expert at marketing.

Counsel for the plaintiff, while not conceding that the tying claim was a tenuous one, was heard to characterize the claim as kin to tying. The court finds, under these facts, that the claim is such a distant cousin it bears no family resemblance to the kind of tying that the antitrust law forbids. The plaintiff has failed to establish his case of tying.

*Territorial Restriction*

■ Where a manufacturer is alleged to have imposed restrictions requiring his distributors to abide by territorial limitations, the agreement is a vertical one, governed by the rule of reason. *Continental TV v. GTE Sylvania Inc.,* 433 U.S. 36, 97 S.Ct. 2549, 53 L.Ed.2d 568 (1977). A plaintiff must show that the defendant's conduct had an adverse effect on competition to prevail under the rule of reason. *Daniels v. All Steel Equipment,* 590 F.2d 111, 113 (5th Cir.1979).

■ The plaintiff has alleged that Wheelabrator-Frye is guilty of imposing an impermissible territorial restriction upon LADSCO. There is no evidence in the record to support this claim. W–F did not restrict LADSCO's sale of shot to any particular territory. In certain areas, such as the Carolinas, W–F competed with LADSCO in the retail market. It is the defendant manufacturer's insistence on distribut-

ing its own product and competing with LADSCO that is the gravamen of the territorial restriction claim. W–F's presence in the market as a distributor of its own goods, troubling though it may be to a distributor such as LADSCO, does not constitute an impermissible territorial restriction violative of Sherman Act values. Indeed, to the extent that LADSCO's real concern is to have W–F withdraw from the market and allow it to be the exclusive distributor of W–F's goods, it is the plaintiff, not the defendant, who would curb competition and risk offending Sherman Act values.

The court in *Red Diamond Supply, Inc. v. Liquid Carbonic Corp.,* 637 F.2d 1001, 1005 (5th Cir.1981), said that to prevail on an antitrust claim for impermissible restrictions,

a plaintiff must show that the defendants' conduct has an adverse effect on competition. *Daniels v. All Steel Equipment, Inc.,* 590 F.2d 111, 113 (5th Cir. 1979); *H & B Equipment Co.* [*v. Int'l. Harvester Co.,* 577 F.2d 239, 246 (5th Cir. 1978)]; *Northwest Power Products, Inc. v. Omark Industries, Inc.,* 576 F.2d 83, 90 (5th Cir.1978), *cert. denied,* 439 U.S. 1116, 99 S.Ct. 1021, 59 L.Ed.2d 75 (1979); *Kentucky Fried Chicken Corp. v. Diversified Packaging Corp.,* 549 F.2d 368, 380 (5th Cir.1977).

Since the plaintiff has not shown it was restricted to certain geographic areas, it comes as no surprise that it has not shown any adverse effect on interbrand competition. Any adverse competitive results in the market are due to behavior of the plaintiff, not the defendants. The plaintiff has complained that W–F would not permit it to have exclusive right to the North and South Carolina market; yet it fired its salesman for that area, effectively abandoning the market to W–F and others. Any plan of the defendant to exclude LADSCO from the Carolina territory was preempted by LADSCO's own withdrawal from that market. The plaintiff will not be heard to complain about being restricted from territory it quite deliberately abandoned. The

plaintiff has not alleged facts sufficient to make out a colorable claim for territorial restriction.

*Group Boycott*

■ The plaintiff alleged that a group of its former suppliers boycotted it and substituted HESSCO as their distributor. There was no substantial evidence, however, of concerted action on the part of these suppliers. Indeed, for reasons of its own, LADSCO did not place any orders with ALCOA, its main supplier for primary aluminum, after August 1979. Nor did it place orders with W–F for shot after this period. Consequently, for these suppliers, the opportunity to boycott LADSCO never presented itself. Though it is true that some other of LADSCO's suppliers did switch to HESSCO, this, by itself, does not establish a conspiracy. LADSCO underwent a major change in August of 1979. The man who had been in charge of the day-to-day operations left the company. The sales team, persons with many years of service and proven ability, also subsequently left. Faced with this, many suppliers could have, individually, come to the conclusion that LADSCO's sales structure was so weakened by these changes that it was no longer the able distributor it once was. Thus, what the plaintiff has established is parallel behavior on the part of several suppliers acting independently in their own interest. There is simply no evidence of an improper motive or concerted action by suppliers. Nor does the effort of LADSCO's dismissed salesman to attract its suppliers constitute a group boycott or a refusal to deal by suppliers. The concerted action must be on the part of the group of suppliers, not third parties. There is no evidence to support plaintiff's group boycott claim.

As the foregoing discussion shows, there has been no violation of Sherman Act values. Fred Hester, a LADSCO Vice-President and Director, resigned. Shortly thereafter, the sales force was fired. Several of the salesmen joined with Mr. Hester and formed HESSCO, which was later purchased by Wheelabrator-Frye. The former LADSCO employees, now in competition

with their old company, used ability and experience to the advantage of their new venture and, predictably, to LADSCO's disadvantage. Some of LADSCO's suppliers left it for the competition. Other of the suppliers, ALCOA and W–F among them, no longer received orders from the plaintiff. These are not the facts of a Sherman Act claim; under the second prong of the *Associated Radio* test, the claim fails.

■ In addition to plaintiff's failure to establish anticompetitive conduct through any of its four claimed Sherman Act values that were threatened, there was no showing by the plaintiff of an adverse effect on competition arising from the transactions in this case. The evidence showed that LADSCO has continued to engage in competition with the new entrant into the market, HESSCO. In the absence of a showing of anticompetitive effect, the decision of a manufacturer to switch from an independent distributor to an in-house distribution system does not establish a violation of Sherman Act Section One. *Red Diamond Supply, Inc. v. Liquid Carbonic Corp.,* 637 F.2d 1001 (5th Cir.1981); *H & B Equipment Co., Inc. v. International Harvester,* 577 F.2d 239 (5th Cir.1978). For these reasons the court concludes that the plaintiff has failed under the *Boeing v. Shipman,* 411 F.2d 365, 373–76 and nn. 13–16 (5th Cir. 1969), standard to satisfy the second prong of the *Northwest Power* test of conduct by the defendants that threatens Sherman Act values.

■ The court also finds as a fact that plaintiff did not satisfy the first prong of the test, because it failed to establish a relevant geographic market and also failed to prove that defendants' actions would be prohibited under the law of mergers. These alternative findings are each sufficient reason not to change the court's earlier ruling granting a directed verdict for the defendants on the antitrust claims of the plaintiff.

The Eleventh Circuit announced the standard for directed verdicts in federal court trials in *Kaye v. Pawnee Const. Co., Inc.,* 680 F.2d 1360 (11th Cir.1982), relying on the former Fifth Circuit's *en banc* decision in *Boeing Company v. Shipman,* 411 F.2d 365 (5th Cir.1969). The *Kaye* court held:

> The Fifth Circuit en banc in *Boeing Company v. Shipman,* 411 F.2d 365 (5th Cir.1969), enunciated the standard to determine whether there is sufficient evidence to submit a case to the jury following a motion for a directed verdict in a federal court trial. The district court should consider all evidence and not just evidence supporting the nonmover's case. The evidence must be considered in the light and with all reasonable inferences most favorable to the party opposed to the motion. If the facts and inferences point so strongly and overwhelmingly in favor of one party that reasonable persons could not reach a different conclusion, the court should direct a verdict. On the other hand, if there is substantial evidence of such quality and weight that reasonable persons in the exercise of impartial judgment might reach different conclusions, the court should deny the motion for a directed verdict and submit the case to the jury. A mere scintilla of evidence is insufficient to present a question for the jury; there must be a conflict in substantial evidence to create a jury question. *Boeing,* 411 F.2d at 373–76 & nn. 13–16.

680 F.2d at 1364 (footnote omitted).

On the antitrust claims in this case, the evidence is overwhelmingly in favor of the defendants. The *Kaye* standard for directing verdicts in federal cases is met here.

*Pendent State Law Claim*

■ Plaintiff's state law claim of unfair competition came before this court solely on the basis of pendent jurisdiction; there is no other basis for subject matter jurisdiction over this claim. The defendants have moved for a directed verdict against it. The court finds that there is sufficient evidence of one or more acts by defendant Hester that prima facie constitute a breach of trust that possibly may be fairly characterized as unfair competition. There is great question, however, whether under Al-

abama law such a breach, if found by a jury, establishes plaintiff's broad claims for destruction of its business by means of the unfair competition alleged in Count Two of the complaint. Furthermore, to proceed with the unfair competition claim after dismissal of the antitrust claim would be impossible without the jury being infected by prejudice from evidence received on the antitrust claim. Thus it would be necessary to retry the unfair competition claim under any circumstances. The court finds that a retrial would be more fairly and appropriately accomplished in the state court.

 *United Mine Workers of America v. Gibbs,* 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966), laid down several considerations that serve as limitations on the assertion of pendent jurisdiction. First and foremost, the decision whether to accept the pendent claim lies in the court's discretion. This was expressly asserted in *Gibbs* and later in *Rosado v. Wyman,* 397 U.S. 397, 90 S.Ct. 1207, 25 L.Ed.2d 442 (1970). There are several reasons why a court would use its discretion to refuse a pendent claim. Examples:

(1) The real substance of the case is the state claim. Even if the federal question is significant, when the main orientation of the case is state based, jurisdiction may well not be taken over the pendent state claim.

(2) The federal claim asserted is frivolous.

(3) There would be jury confusion caused by litigating the federal and state claims together. If the state claim would have to be severed under Rule 42, and separate trials held, then the efficiency-economy consideration is undercut and there is no practical reason for the federal court to take the state claim.

(4) There is a clear statement by Justice Brennan in *Gibbs* that a federal court should dismiss the state-based insufficient claim if the federal claim collapses before trial. This was read as mandatory for many years, but in recent years the Supreme Court has

indicated that this consideration likewise lies within the discretion of the district court.

The federal antitrust claim in this case is totally without merit. A review of the more than two thousand pages of trial transcript reaffirms the correctness of the court's earlier order directing a verdict for the defendants. The plaintiff was not forthcoming with evidence that would even begin to make out an antitrust case. A lesser lawyer inexperienced at evaluating the merits of antitrust claims might have, in his ignorance, failed to recognize the insubstantial, utterly frivolous character of the claims put forth here, but plaintiff's lead counsel, an eminent member of this bar, and an expert on antitrust matters, could not but know he had no colorable antitrust claim. This being the case, the court finds that the formulation and filing of an antitrust claim was but a pretext for getting the pendent state unfair competition claim into a federal court. Customarily counsel will hedge his bet by filing two suits, one in both state and federal court, if there is a colorable pendent claim. That was not done here. This shows a lack of confidence in the state claim. There is, in fact, good reason for such a lack of confidence.

The federal claim in this case did not collapse; it never appeared. There was no substantial evidence of a Sherman Act violation; thus, that claim was a false federal issue incapable of properly founding jurisdiction of a pendent claim in this court. Over the objections of the defendants, the court permitted the plaintiff to enjoy on damages issues liberal evidentiary rulings that were proper *only* on the assumption that legitimate antitrust claims were before the court. Thus the jury was exposed to evidence that could not have been properly admitted to prove the only possibly legitimate claim in this case, the one arising from state law. Much of that evidence is necessarily confusing and prejudicial now that there is no antitrust issue before the court. Fairness and substantial justice between the parties mandates that the state

claim be properly tried and judged on its merits, with a jury untainted by its unfortunate history in this court. The case should be tried in the appropriate judicial system, the state courts of Alabama.

There can be no overlap of issues here between claims because only one true issue exists: the state law claim for unfair competition. Nearly all the evidence of damage was let in under rules which contemplate an antitrust claim. That evidence is inappropriate for a jury's consideration. Thus, this consideration provides no basis for a federal court retaining jurisdiction of this state law claim.

For the foregoing reasons, this case will have to be retried under any circumstances. Because the defendant's state law claim is a novel one (in the context of the facts presented here it is a case of first impression), this court cannot efficiently or authoritatively render judgment on the question, which is wholly a matter of Alabama law.

It is doubtful that the question in this case would qualify for certification to the Alabama Supreme Court. The Alabama Supreme Court rule requires that the certified question be a dispositive issue. It does not render advisory opinions shaping the parameter of doctrines, the requirements, limits, conditions, and exceptions that are the heart of a body of jurisprudence. The novel unfair competition and conspiracy questions presented here require a subtle, nuanced reading of the law that cannot be rendered as a response to a necessarily abstract query from this court.

Finally, comity requires that this court defer to the courts of Alabama for a ruling on the alleged unfair competition claim. That claim, as alleged in the complaint, has never been recognized by the Alabama courts. A preliminary search for Alabama authority has revealed a single case on the general issue, with facts quite dissimilar from the facts here. Thus, what is helpful in that opinion is, for the most part, mere dictum.

As the Supreme Court noted in *Mast, Foos & Co. v. Stover Mfg. Co.*, 177 U.S. 485, 488, 20 S.Ct. 708, 710, 44 L.Ed. 856 (1899):

Comity is not a rule of law, but one of practice, convenience and expediency. It is something more than mere courtesy, which implies only deference to the opinion of others, since it has substantial value in securing uniformity of decision and discouraging repeated litigation of the same question, but its obligation is not imperative. . . . It recognizes the fact that the primary duty of every court is to dispose of cases according to the law and the facts; in a word, to decide them right. In doing so, the judge is bound to determine them according to his own convictions. If he be clear in those convictions, he should follow them. It is only in cases where, in his own mind, there may be a doubt as to the soundness of his views that comity comes into play and suggests a uniformity of ruling to avoid confusion, until a higher court has settled the law.

It is in the interest of both comity and federalism for this court to defer to the courts of Alabama. It is most improper for a federal court, without suitable law to guide it, to plow new ground in a state law field. This court declines the invitation.

Defendants' motion for a directed verdict is granted as to Count One of plaintiff's complaint and denied as to Count Two of the same. The defendants' oral motion to dismiss Count Two of plaintiff's complaint is granted. Count Two is dismissed without prejudice to its disposition in state court. This dismissal is conditioned upon the offer made by defendants, before the court ruled on the motions for directed verdict, to waive any portion of the limitations period as to the unfair competition claim which fell between filing of this action and entry of final judgment. Without such offer, the court would grant the directed verdict motion on behalf of all defendants except Hester, and deny it as to Hester. The only colorable evidence of unfair competition in the record is of actions by Hester before HESSCO was created and before W–F had any connection with Hester.

Plaintiff argues that W–F and HESSCO "joined the conspiracy later." This position ignores the total lack of evidence of conspiracy involving the corporate defendants and further ignores the fundamental truth that one cannot conspire with oneself. The argument that certain salesmen conspired with Hester is without the support of evidence. The proof would not support a verdict against the salesmen, so there is no proven conspiracy for anyone to join. Plaintiff apparently recognized the lack of proof as to the salesmen. It did not sue them. It certainly had no hesitation about suing anyone else.

A separate order in conformity herewith is being entered.